**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,    )
                              )
                              )
                              ) Case No.
                              ) 5:13-CR-00123
                              )
CHRISTOPHER JASON WILLIAMS,   )
          Defendant.      )

---

**\* \* \*  R E D A C T E D  T R A N S C R I P T  \* \* \***

**SENTENCING HEARING**
**BEFORE CHIEF DISTRICT JUDGE JAMES C. DEVER III**
**DECEMBER 2, 2013; 1:00 P.M.**
**RALEIGH, NORTH CAROLINA**

---

**FOR THE GOVERNMENT:**

Leslie Katherine Cooley
Assistant U.S. Attorney
310 New Bern Avenue, Suite 800
Raleigh, North Carolina  27601-1461

**FOR THE DEFENDANT:**

H. Gerald Beaver
Beaver, Holt, Sternlicht & Courie
P.O. Drawer 2275
Fayetteville, North Carolina  28302

PROBATION OFFICER:  Chris Cagle

        Proceedings recorded by mechanical stenography,
transcript produced by computer.

---

**DAVID J. COLLIER, RMR, CRR**
FEDERAL OFFICIAL COURT REPORTER
413 MIDDLE STREET
NEW BERN, NC  28560

```
 1                          I N D E X

 2                 December 2, 2013; Volume I

 3

 4    GOVERNMENT'S
      WITNESSES:              DIRECT      CROSS      REDIRECT
 5

 6    Detective Jody Rosenberg    14        41          51

 7    Detective Chad Smith        52

 8

 9    DEFENSE WITNESSES:      DIRECT      CROSS      REDIRECT

10    Shirley Williams            67        77

11    Linda Oliver                85

12    John Williams               87        94

13    Idell Van-Tol               97

14    Michael Williams           100

15

16    GOVERNMENT EXHIBITS            RECEIVED INTO EVIDENCE

17    Exhibit 1                             30
      Exhibit 2                             32
18    Exhibit 3                             32
      Exhibit 4                             32
19    Exhibit 5                             32
      Exhibit 6                             40
20    Exhibit 7                             58
      Exhibit 8                             62
21    Exhibit 9                             62
      Exhibit 10                            62
22    Exhibit 11                            62
      Exhibit 12                            62
23    Exhibit 13                            62
      Exhibit 14                            62
24    Exhibit 15                            62
      Exhibit 16                            40
25    Exhibit 17                            52
```

```
 1                   P R O C E E D I N G S
 2                     - - - o0o - - -
 3          THE COURT:  Good afternoon and welcome to the
 4   United States District Court for the Eastern District of North
 5   Carolina.  We're here today for the sentencing of Christopher
 6   Williams.
 7          Good afternoon, Mr. Beaver.
 8          MR. BEAVER:  Good afternoon, Your Honor.
 9          THE COURT:  Are you and Mr. Williams ready?
10          MR. BEAVER:  We are, sir.
11          THE COURT:  Ms. Cooley, is the Government ready?
12          MS. COOLEY:  Yes, Your Honor.
13          THE COURT:  At this time I'd ask that Mr. Williams be
14   sworn or affirmed.
15          THE CLERK:  Please place your left hand on the bible
16   and raise your right hand and state your name for the record.
17          THE DEFENDANT:  It's Christopher Williams.
18          THE COURT:  Do you swear that the answers you will
19   make to the Court are true to the best of your knowledge and
20   understanding, so help you God?
21          THE DEFENDANT:  Yes.
22          THE COURT:  Mr. Williams, do you understand that,
23   having been sworn, that your answers to my questions are
24   subject to the penalty of perjury?
25          THE DEFENDANT:  Yes, sir.
```

1          THE COURT:  Have you taken any kind of medicine or
2    any other substances in the last 48 hours that would affect
3    your ability to hear and understand these proceedings?
4          THE DEFENDANT:  No, Your Honor.
5          THE COURT:  Do you know why you're here today?
6          THE DEFENDANT:  Yes, Your Honor.
7          THE COURT:  Mr. Beaver, do you have any reason to
8    doubt Mr. Williams' competence to go forward today?
9          MR. BEAVER:  No, Your Honor, I do not.
10          THE COURT:  Does the Government have any reason to
11    doubt Mr. Williams' competence to go forward today?
12          MS. COOLEY:  No, Your Honor.
13          THE COURT:  Based on Mr. Williams' answers to my
14    questions, my observations of Mr. Williams and the answers from
15    counsel, I do find that Mr. Williams is competent to go forward
16    here today.
17          Mr. Williams, as you know, you're here today having
18    entered a plea of guilty to two charges.  Count 1 of the
19    indictment to which you have pleaded guilty is sex trafficking
20    of children.  Count 2 is also sex trafficking of children.  You
21    entered a plea of guilty pursuant to a plea agreement in this
22    case.
23          In light of some cases from the Supreme Court of the
24    United States, including the *Booker, Rita, Gall, Kimbrough,*
25    *Spears* and *Nelson* cases, the sentencing guidelines are no

1   longer mandatory, they're advisory.  Nonetheless, in accordance
2   with those cases and some cases from the Fourth Circuit
3   interpreting those cases, including the *Carter, Pauley* and
4   *Evans* cases, a sentencing Court still must take into account
5   the now advisory guidelines.  The Court does this by initially
6   making findings of fact and calculating an advisory guideline
7   range.  The Court will then consider any motion that might be
8   made that might move that range either up or down.  The Court
9   will then consider all arguments that your lawyer makes on your
10  behalf, any statement you'd like to make, any victim allocution
11  and the arguments of the Assistant United States Attorney on
12  behalf of the United States.  The Court will then determine
13  your sentence and announce it here in Court today.  That will
14  be the process we'll follow.

15          Mr. Beaver, did you receive a copy of the presentence
16  report?

17          MR. BEAVER:  We did, Your Honor.

18          THE COURT:  And, Mr. Williams, did you receive a copy
19  of that report, sir?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  And did you speak with Mr. Beaver about
22  that report?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  At this time the Court directs that the
25  presentence report be placed in the record under seal in

1   accordance with the Federal Rules of Criminal Procedure.  The
2   Court accepts as accurate the presentence report except as to
3   matters in dispute as set forth in the addendum.  I have
4   reviewed the addendum, it does contain an objection, which does
5   not appear to impact the advisory guideline range.
6            Mr. Beaver, do you want to be heard on that
7   objection?
8            MR. BEAVER:  No, Your Honor.
9            THE COURT:  All right.  The Court will overrule it.
10  I mean, it doesn't impact the advisory guideline range.
11           Is there any other objections from the defense?
12           MR. BEAVER:  No, Your Honor.
13           THE COURT:  Any objections from the United States?
14           MS. COOLEY:  No, Your Honor.
15           THE COURT:  All right.  For purposes of Booker and
16  its progeny then the Court calculates the total offense level
17  as 42, the criminal history category is III, the advisory
18  guideline range is 360 months to life.  Does the Government
19  object to that advisory guideline range?
20           MS. COOLEY:  No, Your Honor.
21           THE COURT:  Does the defense object to that advisory
22  guideline range?
23           MR. BEAVER:  No, Your Honor.
24           THE COURT:  All right.  There is no motion in this
25  case, correct, Ms. Cooley --

1    MS. COOLEY:  That's correct.

2    THE COURT:  -- under 5K?

3    MS. COOLEY:  That is correct, Your Honor.  He did

4 sign a cooperation plea agreement, and we're prepared to advise

5 the Court of that.  We have not recommended a 5K.

6    THE COURT:  I have received and reviewed Mr. Beaver's

7 sentencing memo.  I'll now hear from Mr. Beaver in connection

8 with that.  I know you have a motion under 5H1.13, and you also

9 talked about the 3553(a) factors.  I'll hear from you all at

10 once on those and then I'll hear from Mr. Williams, I'll then

11 hear any victim allocution, I'll then hear from Ms. Cooley, and

12 then I'll hear finally in response anything that Mr. Beaver

13 wishes to say.

14    Mr. Beaver.

15    MR. BEAVER:  Thank you, Your Honor.  May he sit down?

16    THE WITNESS:  Yes.

17    This is a difficult case, it's one of those cases

18 that you read a presentence report, you read the discovery, you

19 want to take a shower somewhere, it's just -- it's a bad case,

20 Your Honor.  We know that it's a bad case.

21    In trying to provide the Court with as much

22 information as we could to try and give the Court as clear a

23 picture of this defendant, his background, his upbringing, and

24 some of the information that was not contained in the report

25 which did appear in some of the discovery on the case regarding

1  particularly the older of the two victims was the matter of the
2  relationship that she had with the defendant over a five or six
3  month period of time.  I provided Your Honor with some letters
4  along with my motion.
5          THE COURT:  I received all the letters you submitted.
6  I've reviewed them.
7          MR. BEAVER:  Yes, sir.  And I also submitted letters
8  from various members of his family.
9          THE COURT:  I have reviewed those as well.
10          MR. BEAVER:  I want to point out to the Court that he
11  does have a strong family background in this matter.  Today
12  there are numerous people here to show their support of him,
13  including his mother Shirley Williams, his brother John
14  Williams, his other brother Michael Williams.  Michael wrote
15  one of the letters that Your Honor received that was attached
16  to the motion.  His aunt, Idell Van-Tol, who is a former client
17  of mine from many years ago that I knew as Idell Gilbert, who
18  has been a Government contractor for over 30 years out in
19  Fort Bragg, is well known within that community.  Also there
20  are many other people, including relatives Rosanne Carter,
21  Mrs. Oliver from his church, his Pastor Bowman and his wife,
22  several other people, cousins, Tracey Brian Gilbert, Cedric
23  Carter, other people.
24          Can I ask all of the folks who are here to show their
25  support for Christopher to please stand.

1    Your Honor, these are people who are representative
2    of his community who have known him his entire life.
3    Thank you, folks.  You can sit down.
4    They have come forward and they have presented
5    themselves to show you that he does have a support system in
6    the community that's willing to help him and willing to come
7    forward.
8    The one thing that I raised in this matter as a
9    matter for the Court to consider for departure or a variance
10   was prior instances of sexual abuse of Mr. Williams at the hand
11   of two babysitters.  They are identified and they are named in
12   the pleadings.  We were able to find the photograph of one of
13   the individuals who is on a sex offender list at this time, we
14   provided the Court.  Mrs. Williams, his mother, has written to
15   you, quite eloquently, I believe, concerning what she
16   experienced at that time.  This was 30 years ago, Your Honor.
17   This was when he was 40 years old -- I mean, I'm sorry, four
18   years old, when he was approximately four years of age.
19   She indicated that she reported this to the police,
20   that she gave the names of the perpetrators at that time, that
21   the police gave one of the perpetrators a polygraph exam, that
22   he had passed the exam, and when faced with the unpleasantness
23   of her two sons having to testify, made the decision that it
24   was not in their best interest at that time, worth going
25   forward, and the matter was dropped at that time.  Your Honor,

1    she is present if necessary to testify to those facts.  I

2    reserve the right to call her if I need to on that.

3            Also her son Michael, who was also being babysat at

4    the same time, is present.  Also her son -- his brother, her

5    son, John is present, who has some limited knowledge of those

6    instances.

7            Your Honor, we are not by any means trying to say

8    that there is an absolute cause and effect between prior sexual

9    abuse as a child and sexual abuse as an adult, but I would be

10   remiss if I did not tell the Court that it has been my

11   experience in the many years that I have practiced law

12   involving sexual deviancy and sexual misbehavior to often find

13   that there is a root cause of it that goes back into often

14   instances of childhood abuse, childhood violence.

15           I read a study this morning that indicated in 2007

16   there was a study done in England that indicated as much as 30,

17   40 percent of the adult sexual offenders had been abused as

18   children.  Michael himself in his letter to Your Honor quite

19   painfully, I believe, recites his history, his sexual history,

20   how this has affected him, how he thinks, that it's affected

21   his brother.  Again, we don't -- we don't rely upon this as

22   something to say this should be just glossed over, it should be

23   ignored, it should not be paid any attention to, this crime,

24   that it was simply caused by the fact that he was sexually

25   abused as a child, but we do think that it is a factor that the

1   Court should consider in determining an appropriate sentence.

2           We also point out the fact that under the

3   United States Code, assuming Your Honor gives him an

4   opportunity at some point in time to have completed the

5   sentence, there are procedures underway or that are available

6   under the United States Code at this time for examination to be

7   carried out, if he were to be found to be a sexually dangerous

8   person at that time, which could result in indefinite detention

9   of him far beyond any term of imprisonment that Your Honor

10  should see fit to impose, and we think that that is an

11  important consideration for the Court to understand that at the

12  end of this sentence, whenever it might be, that if he is a

13  sexually dangerous person, that there are procedures involved

14  to deal with that at that time which can be done and which are

15  frequently done, as this Court can probably attest to and I

16  know Judge Britt can attest to.

17          We ask the Court to show this defendant such mercy as

18  you can under the circumstances of this case, realizing and

19  fully admitting that this is a very, very serious crime and

20  deplorable behavior on this young man's part.

21          THE COURT:  Thank you, Mr. Beaver.

22          At this time I'll hear from Mr. Williams, if you'd

23  like to make a statement, sir.

24          THE DEFENDANT:  Good afternoon, Judge Dever.  I pray

25  this letter finds you in the best of health and spirits.  I

1  wanted to write this letter to let you know how remorseful I am
2  and I wish this had never happened.  The things that happened
3  to those young ladies I wish to no one, not my sister, not my
4  mother, not my cousin, not my daughter.  If I could, I would
5  like to personally apologize to them and let them know how
6  sorry I am.  I am sorry that this has ever happened, and any --
7  and something like this, even close to this, would never happen
8  again.  I am just begging that you don't take away my life and
9  a chance to make amends, make my community better and let the
10 young gentlemen know how they are affecting people's lives
11 around them, their lives and the lives of their family.  I
12 would also like the opportunity to make my mother, kids, family
13 and friends proud one day and show the world that I'm more than
14 what they say on TV and on the news.
15        I have found God, excuse me, and I'm excited to share
16 how good he's been in my life.  People with my type of charge
17 have had a fall, but thanks to God I have been able to change a
18 few lives by bringing them to God, and I was blessed to lead a
19 bible study when I was in jail.  I again implore you to know
20 the facts of the case, the real me, and give me a chance in the
21 world to make a better place through the teachings of Jesus
22 Christ and not what the world and music is teaching and to make
23 my family and friends proud one day.
24        Thank you again for listening, and I pray God touches
25 your heart to see the truth.  I'm forever remorseful, sorry,

1    and praying for a chance to show it.

2              THE COURT:  Thank you, Mr. Williams.

3              At this time I'll hear from Mr. Cooley on behalf of

4    the United States, including any victim allocution.

5              MS. COOLEY:  Thank you, Your Honor.

6              With respect to the victim allocution, neither victim

7    is here today.  We have had lots of conversations, we have

8    visited, we have talked with the therapists involved, and I

9    think that everyone involved has come to the conclusion that

10   the best vehicle for them to be heard would be to write

11   statements that I will read to Your Honor.  I had intended to

12   do that later on during my presentation to the Court, but I

13   could do that now if the Court would prefer.

14             THE COURT:  You can do it at whatever point in your

15   presentation you want to.

16             MS. COOLEY:  Thank you, Your Honor.

17             Your Honor, at this time I am prepared to present

18   evidence regarding the 3553(a) factors and how we would

19   eventually ask the Court to sentence Mr. Williams, specifically

20   with regard to the nature and circumstances of the offense, and

21   we would like to call Detective Rosenberg to the stand at this

22   time.

23             THE COURT:  All right.  You can come up and be sworn.

24             THE CLERK:  Please place your left hand on the bible

25   and raise your right hand and state your name for the record.

```
 1            THE WITNESS:  Jody Rosenberg.

 2                     - - - - -

 3              DETECTIVE JODY ROSENBERG

 4   being first duly sworn, was examined and testified as follows:

 5                     - - - - -

 6                  DIRECT EXAMINATION

 7   BY MS. COOLEY:

 8   Q     Good afternoon, Detective Rosenberg.

 9   A     Good afternoon.

10   Q     By whom are the employed?

11   A     I'm employed by the Fayetteville Police Department,

12   Fayetteville North Carolina.

13   Q     And in what capacity?

14   A     I'm a senior detective in the Youth Services Unit.

15   Q     How long have you been in the Youth Services Unit?

16   A     Since 2004.

17   Q     And prior to that were you with the police?

18   A     Yes, I've been on the Fayetteville Police Department since

19   1998.

20   Q     And as a Youth Services detective, what is your main

21   focus?

22   A     In our unit we're specialized in the investigation of

23   serious domestic abuse, serious child abuse and domestic

24   violence.

25   Q     And are you lead detective in the case involving
```

1   Mr. Williams?

2   A    Yes, I am.

3   Q    How did you come to be involved?

4   A    I was on call the day -- January 5th, 2012.

5   Q    And what was significant about that day?

6   A    I had a call from my sergeant, Sergeant Hart, that there

7   was a young girl that had come down to the police department

8   with her guardian, she had told the desk officer that she had

9   been held against her will and she and her guardian wanted to

10  make a police report.

11  Q    And what did you do when you came into contact with that

12  victim?

13  A    I brought them up to our unit, which is, as I said, a

14  specialized unit, and we deal with juveniles, so it's different

15  than other parts of the police department.

16  Q    And are you trained in forensically interviewing children?

17  A    Yes, I am.

18  Q    And with respect to this victim -- we'll refer to her as

19  Victim Number 2, as she's listed in the indictment.

20  A    Um-hum.

21  Q    With respect to Victim Number 2, what kind of conversation

22  did you have with her?

23  A    I started out, as I'm trained, in the RATAC forensic

24  interviewing technique.  I talked to her -- first I talked to

25  her guardian and got her background, excuse me, and then I went

1    ahead and brought her into our soft room and I started the

2    interview process with her.

3    Q    And what's a soft room?

4    A    It's a -- it's a friendly environment for children.  It's

5    not a sterile interview room.

6         I started the interview, and I just built up a little

7    rapport with her.  She was very closed.  She had her hood over

8    her face.  You could tell that she was very uncomfortable being

9    there.  She told me that, you know, her aunt wanted her to

10   come.  She referred to her as her sister, but really it was her

11   cousin, her guardian, and as I started the process of

12   interviewing her, I was able to go ahead and find out a little

13   bit about her, that she was a student at a high school, she was

14   14 years old, and that she had been a runaway.

15        She had been -- as the process of the interview went

16   on, she told me that she had been held against her will, that

17   she had met a friend on the website "Tagged" and they had

18   arranged to meet in her home town of Raeford, which is outside

19   of Fayetteville.  Her friend, Victim Number 1, and the

20   defendant, Mr. Williams, picked her up from a fast food

21   restaurant and she thought everything was fine, she said that

22   she thought that Mr. Williams was a relative and she didn't

23   know anything different than that.  He was driving the car.

24   They were listening to music, everything seemed fine, and she

25   thought she was just going for a visit with her friend, and

1   when they got to what she thought was her friend's apartment,
2   they went in, and that's when things drastically changed
3   Q    And what happened inside the house?
4   A    Her phone was taken from her, in front of her, it was
5   stomped on by Mr. Williams, and she was told that she wasn't
6   going to be able to contact anybody now, that she was here and
7   she was going to be working.
8   Q    And did Victim 2 then go on to describe to you a period of
9   time after she initially arrived at Mr. Williams' apartment?
10  A    Yes.
11  Q    And what period of time was that?
12  A    I'm sorry, the period of time?
13  Q    That she was with Mr. Williams.
14  A    The victim, Victim 2, had been with Mr. Williams for quite
15  some time, like approximately eight months.
16  Q    Is that Victim 1 that had been with the defendant?
17  Victim 2 is the second victim to arrive at the house; is that
18  correct?
19  A    Yes.  Yes.
20  Q    And Victim 1 is the victim who had been with Mr. --
21  A    Victim 1 had been -- I'm sorry.  Correction.  Victim 1 had
22  been with Mr. Williams for approximately eight months.
23  Q    And Victim 2, what did she describe happened to her once
24  she was in Mr. Williams' custody?
25  A    She said that she was made to have sex with him, she was

1  photographed by Mr. Williams in sexually provocative positions

2  and she was told that these would be put on a website.  She

3  told me that it was a BackPage website and that the men would

4  see their pictures on this website and that they would come to

5  this apartment.  She had cardboard that was in the photo

6  showing, you know, the phone number to call and she also told

7  me the price of the different services that she would perform.

8  Q    And what were those services and at what prices?

9  A    If you would let me -- allow me to look at my notes.

10 Q    Would it help you to refresh your recollection?

11 A    Yes.

12       Okay.  The client said she remembered them being for

13 15 minutes with her it would be $50, for 30 minutes it would be

14 $70, and for an hour it would be $100, and for eight hours or

15 an all-nighter it would be $400.

16 Q    And with respect to that money, how did that money change

17 hands?  Did she tell you?

18 A    The clients when they would go up into the room where she

19 would perform the sexual acts with them were told to leave the

20 money on the dresser there.  At no time was she allowed to

21 touch this money.  Mr. Williams would come up and collect the

22 money when they had left.

23 Q    Now, this room that she performed the services in, was

24 that located in Mr. Williams' apartment?

25 A    Yes, it was.

1    Q     And did she mention anything to you about why she

2    continued to remain with Mr. Williams?

3    A     Mr. Williams would threaten her and threaten the other

4    victim, and she personally witnessed the other victim being

5    physically abused by him, and she was afraid for her life.

6    Q     Did she describe to you the interior of the defendant's

7    home?

8    A     Yes, she did.

9    Q     And after you spoke with the victim, Victim 2, what if

10   anything did you do at that point?

11   A     After I got a good disclosure from her what had happened,

12   I told her that of course we would be in contact with her and

13   she would -- you know, told her guardian that we would be in

14   contact and get her services.  I went ahead and found the

15   address to where she had said that she had been at.  At that

16   time I contacted another officer and I went out to that

17   address.

18   Q     Did Victim 2 mention to you at any time her motivation for

19   coming forward with this information?

20   A     Yes.  She was really not as much concerned about herself,

21   in fact she was really apprehensive about coming forward, but

22   she was very concerned about the other victim, Victim 1, she

23   had witnessed many times where she had been abused by

24   Mr. Williams and she was really afraid for her.  Her

25   motivation -- and the whole time that she was talking to me,

1    she said, "You are going out there to find her, aren't you?"

2    And I told her, assured her that I would go out there and

3    attempt to find her.  She was very much afraid for her.

4    Q    For Victim 1?

5    A    Um-hum.

6    Q    How did Victim 2 tell you that she escaped from

7    Mr. Williams' custody?

8    A    After being held by Mr. Williams, she started -- and

9    having sex with numerous people, she started having some

10   stomach cramps and some bleeding, and she had said something to

11   the victim -- Victim Number 1 that maybe she thought she might

12   be pregnant, and Mr. Williams had heard this and he actually

13   put her out.

14   Q    And when you went to -- after receiving all this

15   information from Victim 2, when you went to the defendant's

16   house, what if anything did you find there?

17   A    When I first got to the residence, he would only talk to

18   me through the screen door, but I was able to see that the

19   couch and the carpet and the surroundings were exactly what the

20   Victim Number 2 had described to me.

21   Q    And what was the nature of that conversation with the

22   defendant?

23   A    I told him -- I identified myself and told him that I was

24   there to -- that I had some information that had come forward

25   and I asked him if he knew of Victim Number 2's name, and he

1    said he vaguely remembered it, after talking to him for a

2    while, and he said that there was a bunch of girls, teenage

3    girls, that used to hang around in the neighborhood in the

4    apartment complex, but that he had never had her into his

5    house.  He identified -- he knew what her name was, but that

6    she had never been in his house before.

7            I told him that the purpose of my visit was that I

8    was very concerned because this victim had told me that there

9    was another girl that was a runaway that had been in the

10   residence with her, and at that time Mr. Williams said --

11   denied having anything to do with Victim 1 or Victim 2.  He

12   told me that I was welcome to come in.  It did take him quite a

13   long time after I had the conversation with him through the --

14   through the door, he closed it, he said that he had to tidy up

15   his residence before I was to -- before he would let me come

16   in, which was concerning to me.  There was another -- as I said

17   previously, an officer that was at the side of the residence

18   just to make sure that nobody exited out the back door.

19           He eventually came to the door and he allowed me in.

20   He told me that I was welcome to look anywhere in the

21   residence.  The first thing that I noticed, of course, was the

22   couch that was described to me by Victim Number 2.  The carpet

23   was as she described.  The rooms were as she described.  The

24   kitchen was downstairs, the bedrooms were upstairs.  Everything

25   totally corroborated what the victim had told me in this

1   interview.

2   Q    Had the house been tidied?

3   A    No, the house was very, very filthy, the carpet was very

4   filthy, there was things scattered everywhere, magazines,

5   ashtrays, movies.  It was very dirty.  The kitchen area was

6   very dirty.  There was dirty dishes in the sink, there was

7   dirty things on top of the stove.  Food had just been made,

8   there were two plates of food that were right there on the

9   counter that were warm, the oven was still warm, and I asked

10  him -- you know, he told me that there was nobody in the

11  residence, and I asked him, you know, this food has just been

12  cooked, are you expecting guests, and he said that he was.  I

13  said, but your guest isn't here yet, when are they -- when are

14  they going to be coming?  And he said that, you know, they

15  would be coming, and I just made the comment that that was kind

16  of unusual because I would -- personally I would never go ahead

17  and serve food and let it get cold before my guest arrived, and

18  he thought that was -- that was kind of funny.

19          I heard noise coming from a room off the kitchen and

20  I was immediately kind of unnerved by that and I asked him,

21  you know, what that noise was, and he told me that he had his

22  dog in there, and I asked him, you know, what kind of dog,

23  you know, dogs are concerning sometimes and I wanted to know

24  what kind of dog it was, and he told me it was an Akita, and I

25  asked him what -- you know, was this a big dog or a little dog,

1    and he said, well, you know, he explained to me Akitas,

2    you know, they're very expensive dogs, that he had paid $1,000

3    for this dog, and thinking back that was also what Victim

4    Number 2 had said too, she described a dog, she described a

5    little puppy, white and brown, and so --

6    Q    Was it in fact a white and brown puppy?

7    A    Yes, he opened the door and there was a little puppy in

8    there, it was white and it was brown and it had been in this

9    bathroom for quite some time, the smell that came out of that

10   room was horrible, had feces, and that poor dog had been in

11   there for a long time.

12   Q    And with respect to your inspection of the rest of the

13   house, were there women's items anywhere in the house?

14   A    Yes.  This was a -- the bedrooms were upstairs at the top

15   of the stairs and in the front bedroom there was a bunch of

16   women's lingerie items, a lot of underwear, a lot of women's

17   clothing, and I asked him about that and he said that the

18   clothing items belonged to his ex-wife.  In the back bedroom

19   there was an ironing board with a lot of condoms on it, there

20   was a large bed and the bed -- the coverings were all in

21   disarray.  The bathroom had women's items in it, hairspray and

22   things like that.  I asked him again, you know, that I was

23   really concerned about this -- about Victim Number 1, and he

24   said that, you know, she wasn't there.

25   Q    Now, at some point did you come to leave the residence

1    that afternoon?

2    A    Yes.  Before we left I noticed that there was a crawlspace

3    up above as you went up the stairs in the landing, and I asked

4    him, you know, did he have anything up there, and he said you

5    are free to take a look, so Officer Rivera was with me, and I'm

6    not very tall and he wasn't very tall but he was able to do a

7    cursory search in this crawlspace, and we –– you know, we

8    didn't see everything, everything was intact, the insulation

9    was there, there was rafters, but there was nothing that we

10   could see.  When I was there, I did call out XXXXXX's name,

11   several times through the time I was in the apartment I did

12   call out "XXXXXX" several times, and I did get no response.

13          I thanked Mr. Williams and we went outside.  At that

14   time I told him that if he had seen her, you know, to please

15   give me a call.

16          Officer Rivera was at that time aware that

17   Mr. Williams had a warrant for his arrest, I did not know that

18   he was checking on that, I did not know that Mr. Williams had

19   any kind of paperwork on him.  I was present when Mr. –– or

20   Officer Rivera placed him into custody, did a pat-down and

21   located some marijuana on his person, and he was ––

22   Q    So at that time was the defendant taken away from the

23   residence?

24   A    Yes, he was taken into custody and transported down to

25   Cumberland County Detention Center.

1  Q    Did he then pretty immediately bond out on those charges?

2  A    Yes.  Yes.  He was released with an unsecured bond.

3  Q    And after your visit to the defendant's house, how did

4  that sit with you, that drove your further actions?

5  A    Everything that Victim Number 2 had told me just --

6  everything matched up, the food that was there, the puppy,

7  you know, the items in the home, the length of time that it

8  took, all of this weighed heavy on me.  I thought about it

9  constantly throughout the weekend.  Just call it intuition, I

10 just felt like I needed to go back out there, so that Tuesday

11 morning I contacted another detective in my unit and we went

12 out, back out to the residence.

13 Q    And when you arrived back at the residence, what did you

14 first see?

15 A    I saw Ms. Shirley Williams out there, his brother John

16 Williams, a moving van and Mr. Williams, the defendant.  They

17 were moving items out of his apartment.  I walked up to him,

18 and immediately he became loud and yelling at me, telling his

19 mother that I was the -- I was the detective that had him

20 arrested, that I was the detective that caused damage to his

21 crawlspace, and immediately I thought that that was unusual

22 because myself and Officer Rivera did not cause any damage,

23 I mean, he's a very small man and I'm very short and it was

24 just a cursory search, there was no damage when we left.

25         Mr. Williams went into the residence, I had a photo

1    of Victim Number 1 with me, and I just talked to Ms. Williams.

2    She was a very nice lady.  Mr. John Williams was there, and I

3    just explained to them that I was here because I really was

4    concerned for XXXXXX, I had -- I'm sorry, Victim Number 1.  I

5    was very concerned because with everything within my being, all

6    my investigative skill, I really believed that she was there,

7    so I showed a picture to Mrs. Williams and she looked at it and

8    I just explained to her that this little girl had been gone for

9    a long time and her mother was very concerned, and I know

10   Mrs. Williams was very interested in hearing that, and she

11   looked at the photo, and her son John came over and he said,

12   well, isn't that the girl that's in there, and Mr. Williams was

13   there and he said, no, no, no, that's just an overnight guest.

14   Q    Mr. Williams the defendant said this?

15   A    The defendant said, no, that's just an overnight guest,

16   and Mr. Williams, John Williams, said, well, that sure looks

17   like her, but she's a lot skinnier than what's in this photo.

18   Q    Now, the photo you had, that was taken before --

19   A    Yes.

20   Q    -- Victim Number 1 went into Mr. Williams', the

21   defendant's, custody?

22   A    Yes.  That was prior, when she was still living at home

23   with her mother and her younger siblings, they had gone on a

24   hike and she in this photo was very happy and things were fine.

25   Q    Now, after you learned that Victim Number 1 might

1    potentially be inside, what happened at that point?

2    A    Mr. -- the defendant, Mr. Williams, went into the home and

3    his mother said, you know, Chris, Chris, that, you know, you

4    need to bring her out, you need to bring her out of the house,

5    and he closed the door, she went up to the door and she said,

6    you need to go ahead and let her come out.  He didn't come to

7    the door.  The door was locked.

8            Eventually he did come out and he said -- you know,

9    he challenged me and he challenged everybody, saying "She's not

10   in there," and "My guest has left, she's not in there."

11   Immediately we noticed that he had some debris on the top of

12   his head, and he was -- the whole time he was very antsy,

13   very -- his behavior was kind of unusual, and so he said,

14   you know, you can go in, she's not in there, you can go in.

15           So we went into the residence and right away upon

16   walking into the residence there was debris on the stairway, it

17   looked like insulation.  Of course all the furniture and all

18   the surrounding -- the things, personal items had been removed

19   from the residence, but the insulation as it was found to be

20   was all the way up the stairway.  So we went up the stairway

21   and at this point Mr. John Williams was very concerned, because

22   he saw the insulation in the defendant Chris Williams' hair,

23   and he went up there and he went ahead and looked up into the

24   crawlspace, and he came back down and he told Detective

25   Chandler, who was with me, he pointed and said, "She's up

1    there."

2            We called, I called, I said "XXXXXX, you need to come

3    down," or, I'm sorry, Victim Number 1, you need to come down

4    from there, we're very concerned for you, and no response.

5            At that point I went ahead and I called -- or an

6    officer called for the fire department to come and bring a

7    ladder truck, because at this point I'm very concerned, the

8    things that, you know, Mr. John Williams had said, that she's

9    very -- you know, she's skinnier than what's in the photo, the

10   fact that now she's up in that area that we previously looked

11   at, I didn't know, you know, what she was going to be like.  It

12   was very, very, you know, exigent circumstances,

13           So the fire department was on their way.  They

14   arrived.  At the same time a K-9 officer arrived, and I was

15   talking to XXXXXX, there was no response, I didn't know how she

16   was, and I asked her, please come down, you know, we're

17   bringing a ladder, please come down, and the K-9 officer's dog

18   had barked and at that point the ladder was put into place and

19   she did emerge from the crawlspace.

20           The crawlspace also, I will add, was very much

21   damaged, it was -- it was -- it had a lock on it, it was

22   locked, the wood around the -- the framework around the opening

23   to get into the rafters was all splintered, it was all damaged,

24   that was not like that when I had been out there that Saturday

25   night, and when she came down she was just -- she was

 1  definitely not like the photo, she was way different than the
 2  photo that I had seen that her mother had provided to me
 3  Q    Now, did you direct that photographs were taken of the
 4  interior of the house after Victim 1 was retrieved from the
 5  attic?
 6  A    Yes, just of the crawlspace and just of the entrance into
 7  the residence.
 8          MS. COOLEY:  Your Honor, may I approach?
 9          THE COURT:  You may.
10  BY MS. COOLEY:
11  Q    Detective Rose, I'm approaching with Government's Exhibit
12  1, if you could take a look at that photograph and let me know
13  if you recognize it.
14  A    Yes, I do.
15  Q    And what do you recognize it to be?
16  A    That is the crawlspace in the defendant Christopher
17  Williams' residence.
18  Q    And is that in the same condition that you observed it on
19  January 8th of 2013?
20  A    No, it is not.
21  Q    Okay.  And how is it different?
22  A    The framework is broken, the drywall is damaged, the door
23  looks to be damaged.  It's not at all --
24  Q    And is that how you observed it on the day that Victim 1
25  was rescued from the attic?

1    A    Yes.

2    Q    How it appears in this photograph?

3    A    Yes, this is how I remember it.  The insulation which was

4    in other photos was, of course, all down on the -- down below.

5         MS. COOLEY:  Your Honor, I move Government's 1 into

6    the record at this time.

7         THE COURT:  It will be received.

8    BY MS. COOLEY:

9    Q    Now, after you retrieved Victim 1 out of the attic, did

10   you take her down to the station into your soft room?

11   A    She came down to the police department.  She did have some

12   paperwork on her that had been registered, so she was a

13   runaway.  At that time I didn't know the full extent of what

14   had happened to her, so she was placed in an interview room.

15   Q    And in the interview room, was that recorded?

16   A    Yes.

17   Q    And did you have a chance to talk to her in that room?

18   A    I did.

19   Q    And how many times or over what period would you say you

20   spoke with Victim 1 about what had happened to her?

21   A    It was a process of disclosure.  It was a very long time.

22   I can't tell you without looking at the videos exactly how

23   long, but it was hours.

24   Q    And I first want to ask you about any physical

25   observations that you made of her that were different from when

1    she had been reported missing.

2    A    Again, her weight.  She was almost emaciated.  She was

3    very thin compared to the photo that I had seen of her that had

4    been taken a year, a year and a half prior to her being

5    discovered in that crawlspace.  She had tattoos that were not

6    there in the photo with her family.

7    Q    And I want to come back to the discussion you had with

8    Victim 1, but while we're talking about the tattoos, what did

9    she tell you about why she received those tattoos?

10   A    She told me that the defendant, Chris Williams, had told

11   her that he needed to give her tattoos to make her look older

12   than she appeared.

13          MS. COOLEY:  Your Honor, may I approach again?

14          THE COURT:  You may.

15   BY MS. COOLEY:

16   Q    Detective Williams, I'm approaching with Government's 2

17   through 5.  If you could just flip through those and let me

18   know if you recognize those.

19   A    Yes.  Exhibit 2, that is a tattoo that I observed on

20   Victim Number 1's arm; that is -- in Exhibit Number 3, that's

21   another tattoo that was on her arm, with her initial; on her

22   chest on Exhibit Number 4; and then behind her ear.

23   Q    And with respect to the tattoo in Exhibit Number 2 on her

24   bicep, what does that depict?

25   A    It looks like a flower.

1    Q    And with respect to the tattoo in Exhibit 3 on her

2    forearm?

3    A    That is her initial.

4    Q    And with respect to Exhibit 4, the tattoo on her clavicle?

5    A    That looks like some tribal -- some Chinese writing.

6    Q    And with respect to Exhibit 5 on her neck, or behind her

7    ear rather?

8    A    It looks like -- she told me that was musical notes.

9            MS. COOLEY:  Your Honor, we'd ask that 2 through 5 be

10   taken into the record.

11           THE COURT:  They'll be received.

12           MS. COOLEY:  Thank you.

13   BY MS. COOLEY:

14   Q    Now, after she was photographed and you began your

15   discussions with Victim 2 -- with Victim 1, excuse me, how did

16   that go?

17   A    In the beginning of the interview with her she was -- she

18   didn't make a disclosure that anything had happened, everything

19   was just, you know, fine, that Mr. Williams was a friend of

20   hers and that nothing had happened to her.  After talking to

21   her and assuring her of her safety and the fact that Victim

22   Number 2 had come forward, she -- her demeanor began to change.

23   She started to cry and she was very overwhelmed that somebody

24   would be concerned for her.  I explained to her what Victim

25   Number 2 had told me about her safety and that she didn't

1    really care about herself but that she really cared about

2    Victim Number 1, and that seemed to get across to her that

3    there were people that cared what had happened to her.

4    Q    And at that point in time did you talk with her about what

5    she had been through?

6    A    Yes.

7    Q    What did she tell you?

8    A    She started to disclose that she had been with

9    Mr. Williams since, you know, almost the time that she ran

10   away, that they had been in one apartment and that they moved

11   to another apartment.  In these apartments she lived with him

12   for a while and then he had told her that she needed to start

13   making some money and that how she would make money would be

14   through the BackPage, that they would -- that she would be

15   advertised in sexually explicit positions and that she would

16   have to perform sex with these clients, as she would call them,

17   coming to the apartment.

18          She said that she had a name -- several names that he

19   would advertise her as, and she told me the process of how this

20   would happen.

21          She told me what Victim Number 2 told me about the

22   money, about the money that would be exchanged, that she never

23   got to have any of this money, that the men would come and she

24   would have sex with them.  She told me about the sex

25   trafficking over and over again and that she was made to do

1    that and she had sex with Mr. Williams, with the defendant,

2    Chris Williams, several, several times a week.

3    Q    At some point in time did you allow her to see her mother?

4    A    Yes.  Her mother I called when we had transported her --

5    transported her down to the police department, and I had been

6    in contact with her mother before that, that's who had provided

7    me the photo of her.  Her mother had not seen her since she had

8    ran away, and when they met each other, or when her mother went

9    into the interview room, Victim Number 1 just broke down

10   crying.  At that point I went ahead and I left and let them

11   have some time.

12            And let me back -- when I told Victim Number 1 that

13   her mother was concerned for her too, that also started a

14   process of the disclosure also and that she really wanted to

15   see her mother, so when her mother did come to see her, they

16   hugged and they kissed and they were reunited.  She told her

17   things in the interview room that I was able to observe and it

18   was recorded, and she broke down crying and it was just -- it

19   took me aback, it drove me to tears when I saw that, and I'm a

20   seasoned detective and that really got to me as a mother, that

21   she just broke down and had almost like a guttural -- a cry

22   from inside herself to her mother, saying that Mr. Williams

23   had -- the defendant, Chris Williams, had beat her, and that

24   was really hard.

25            When I went back and I talked to her later, she did

1    tell me that that was the reason why she did not -- she heard

2    me that first Saturday when I was there, that she was afraid

3    that he would get out again and that's why she didn't tell me

4    in the beginning of the interview what had happened to her,

5    because he had got out on Saturday and he was back within

6    hours.

7    Q    And when you say he had gotten out, are you referring to

8    the first time that you went to the house and he was arrested?

9    A    Correct.  That Saturday when she -- and she told me she

10   was up in the crawlspace, up in the attic, and she heard me

11   calling over and over again, and she didn't say anything

12   because she told me that she was afraid that he -- well, he

13   told her that she better not say anything or he would beat her,

14   and so when she was found the second time, she wasn't real

15   cooperative in the beginning because she thought that he would

16   get out again, as he did on Saturday.  When I assured her that

17   she was safe and that wouldn't happen, that's when the

18   disclosures started coming; and she was very much afraid.  He

19   had made threats to harm her, to harm her family.  He knew

20   where her mom worked and at one point they drove by there, and

21   he made references to knowing where her mom worked.

22   Q    With respect to when a victim is interviewed, is there

23   also a medical exam that accompanies a child interview?

24   A    Yes.  When there is a disclosure of sexual abuse, sexual

25   abuse to this magnitude, we needed to go ahead and get her

1   immediate care.

2          After she had immediate care at the hospital, I

3   scheduled a child medical examination with Dr. Taylor Thomas,

4   who is our child abuse forensic physician at the SRAHEC, South

5   Regional AHEC, and she performed the sexual examination of

6   Victim Number 1

7   Q    And with respect to that, did you obtain a release for

8   those medical records from Victim Number 1 and her mother?

9   A    I did.

10  Q    And what conditions was she found to be suffering from

11  during that medical exam?

12  A    Dr. Taylor Thomas had found that -- or she had had

13  multiple sexual encounters.  She found her to have

14  post-traumatic stress disorder.  She found her to have sexually

15  transmitted disease.  She had one that's highly transferable,

16  it's called Trichomonas, and when the lab -- there's a lab at

17  this medical facility, and when her specimen was brought to the

18  lab, the lab's supervisor, Toni Horn, came directly to

19  Dr. Thomas' office and it was very -- I mean, it was very

20  emergency like when she came, she came very quickly, and,

21  you know, people were scattering and Dr. Taylor had told me

22  later that this was the worst case of Trichomonas that she had

23  seen.

24  Q    With respect to your investigation into the defendant's

25  conduct, did you try to confirm whether or not he had the same

1   sexually transmitted disease?

2   A    I did.

3   Q    And what was that process?

4   A    That the test was done as specified by the lab supervisor

5   of how to obtain that specimen and that was done at the

6   Cumberland County jail and it was brought to the lab and it

7   tested positive for Trichomonas.

8   Q    With respect to your further investigation, did you also

9   obtain the rental contracts that the defendant signed at the

10  apartment complex?

11  A    I did.

12            MS. COOLEY:  May I approach, Your Honor?

13            THE COURT:  You may.

14  BY MS. COOLEY:

15  Q    Detective Rosenberg, this is Government's Exhibit 6.  If

16  you could take a moment and look through that and let me know

17  if you recognize that document.

18  A    Yes.  These are the rental agreements for both apartments

19  that Victim Number 1 had told me that she lived in with the

20  defendant.

21  Q    And does it reflect the rent that the defendant paid in

22  each of the two apartments --

23  A    Yes, it does.

24  Q    -- during the time he had Victim 1?

25  A    Yes.

1    Q    And what was that rent per month?

2    A    On the one apartment that they rented it was $575, and on

3    the apartment where I located Victim Number 1 it was $595.

4    Q    And were you able to determine if the defendant had a job

5    during the time that he was selling the victims online?

6    A    No, I did not.

7    Q    You weren't able to determine that he had a job?

8    A    No, he did not.  He was not employed.  In my conversation

9    with him he said that he worked at several restaurants in the

10   Fayetteville area, but he was not employed.

11   Q    Were you ever able to determine if the defendant had

12   trafficked any other girls online?

13   A    There was evidence and there was –– Victim Number 1 had

14   said that there were other girls at the first apartment, but I

15   was never able to locate them.

16   Q    Were there other photographs of unidentified girls located

17   on the defendant's phone?

18   A    Yes.

19   Q    Now, with regard to the defendant's phone, did you send

20   that to Detective Smith for forensic examination?

21   A    I did.

22   Q    And that was a phone that was seized from him when he was

23   arrested?

24   A    Yes.

25   Q    In preparation for the sentencing hearing were you asked

1   to look into information regarding Robert Wayne McLeod?

2   A    I was.

3   Q    And with respect to that information, were you able to

4   find the case information for which he is currently on the

5   sex offender registry?

6   A    Yes, I did.

7   Q    And in that case for which he is on the registry, is the

8   defendant or any of his siblings -- are they mentioned as

9   victims in those cases?

10  A    No, they are not.

11  Q    What is the age and sex of the victim in that case?

12  A    The victim that the individual is on the registry for was

13  a female and she was 21 years old.

14  Q    And in your training and experience, are sex offenders

15  typically preferential in their choice of victims?

16  A    Yes, they are.

17  Q    Meaning what?

18  A    Meaning that sex offenders are preferential, most sex

19  offenders.  Now, it's not 100 percent, but most sex offenders

20  are preferential in their victims, they tend to either like

21  boys or girls, and they're age specific also.

22  Q    And did you print that case information and provide it to

23  me earlier this morning?

24  A    I did.

25           MS. COOLEY:  If I may approach with Government

1    Exhibit 16, Your Honor.
2              THE COURT:  You may.
3    BY MS. COOLEY:
4    Q    I'm approaching with Government Exhibit 16.  For the
5    record, is this the case information that you provided to the
6    Government earlier this morning regarding Mr. McLeod?
7    A    Yes, it is.
8              MS. COOLEY:  Your Honor, we'd ask that Government 6
9    and 16 be made part of the record at this time.
10             THE COURT:  They'll be received.
11             MS. COOLEY:  Thank you.
12   BY MS. COOLEY:
13   Q    During your investigation into the defendant, you had
14   several opportunities to speak with him, with his mother, with
15   his brother John; is that fair to say?
16   A    Yes.
17   Q    And at any point during those interactions did any of them
18   mention to you the fact of this defendant's prior sex abuse as
19   a young boy?
20   A    No, they did not.
21             MS. COOLEY:  I have no further questions for
22   Detective Rosenberg, Your Honor.
23             THE COURT:  Thank you.
24             Cross-examination?
25             MR. BEAVER:  Thank you.

```
 1                    CROSS-EXAMINATION
 2   BY MR. BEAVER:
 3   Q    Detective Rosenberg, you had an opportunity to speak to
 4   Victim Number 2's guardian, did you not, Crystal Cooper?
 5   A    Yes.
 6   Q    On the day that -- same day that you spoke to
 7   Ms. Cooper -- I'm sorry, to Victim Number 2, I believe it was,
 8   was it not?
 9   A    Yes, sir.
10   Q    And there had been several days since she had gone back
11   home that -- and it wasn't until she got to school that she
12   reported what had occurred to her, is that correct, several
13   days after she had gone home, to Ms. Cooper's home?
14   A    Are you talking about the victim herself or the guardian?
15   Q    I'm talking about Victim Number 2.  Had there been a
16   period of time between the time that she had arrived home and
17   the time that she reported the abuse at school?  Was it several
18   days later?
19   A    It was several days later before they came to see me, but
20   it wasn't for a lack of trying to report.  Crystal Cooper had
21   told me that she did contact the Hoke County Sheriff's
22   Department and was told because of the address of where it
23   occurred, that she would have to go ahead and report to the
24   Fayetteville Police Department.
25   Q    Well, do you recall Ms. Cooper telling you that Victim
```

1   Number 2 had a problem with the truth and that's the reason she

2   didn't come to the police department before the date that she

3   interviewed you?

4   A    We had a long conversation, Ms. Cooper and I, and yes,

5   Victim Number 2, as a lot of troubled teens, did have a little

6   issue with telling the truth, but something -- this differed in

7   what there had been previously.

8   Q    So I take it the answer to my question is yes, she had

9   said that Victim Number 2 had a problem with telling the truth

10  and that's the reason she hadn't reported the abuse earlier?

11  A    Not exactly, but --

12            MR. BEAVER:  May I approach the witness, Your Honor?

13            THE COURT:  You may.

14  BY MR. BEAVER:

15  Q    I want to show you page 3 of a report of yours and ask you

16  if you will review the second sentence of that report.

17  A    That is why Ms. Cooper said she didn't come to the police

18  department before this Saturday.

19  Q    And why did she say she didn't come to the police

20  department before this Saturday?

21  A    She was tired of her behavior.

22  Q    And?

23  A    And she had a problem telling the truth.

24  Q    And what she's talking about, she had a problem with

25  telling the truth, who is Ms. Cooper referring to, Victim

1  Number 2?

2  A    She is referring -- yes.

3  Q    Okay.  And those are your words that you wrote in your

4  report?

5  A    That's -- that's it.

6  Q    Okay.  Now, you spoke with Victim Number 1 also, did you

7  not?

8  A    I did.

9  Q    Victim Number 1 ran away in March of 2012, did she not --

10 A    Yes.

11 Q    -- from a group home?

12      And she was in a group home on juvenile probation on

13 a delinquency case, was she not?

14 A    She was.

15 Q    And she ran away from the group home in March; is that

16 correct?

17 A    I'd have to look, but the report --

18 Q    Would you look and see if that's correct?

19      MR. BEAVER:  Your Honor, may I approach the witness

20 for a moment?

21 Q    May I see those leases, please?

22 A    You may.

23      You have the report from the sheriff's department, it

24 was the Cumberland County Sheriff's Department, and that's when

25 she ran away.

1    Q    And when was that?  When was she reported to have run
2    away?
3    A    You have that report with you.
4    Q    I'm sorry, I do not.  I'm sure I have it in my discovery
5    somewhere here.
6    A    Well, I know --
7    Q    In either event, there was a number of months between the
8    date she ran away from the group home and when she met the
9    defendant; is that correct?
10   A    It was a matter, I believe, of days when she met the
11   defendant.
12   Q    Let me ask you just to refresh your recollection if she
13   did not run away from the group home in March of 2012 --
14   A    The date I'm not sure of she did run from the group home.
15   She was in the Cumberland County group home.
16   Q    And she reported meeting the defendant sometime in about
17   the middle of May of 20 --
18   A    That is correct.
19   Q    -- 12?
20         So approximately two months go by that her
21   whereabouts were completely unknown.
22   A    That is correct.
23   Q    Did you make inquiry as to what she was doing during that
24   period of time?
25   A    Yes, I did.

1    Q    And what did you find out that she -- what did she tell
2    you she had been doing during that period of time?
3    A    She was living with other people, and that's eventually
4    how she came to know the defendant, Mr. Williams.  She met a
5    girl at a strip club that Mr. Williams frequented and knew and
6    that's how she came to know Mr. Williams.
7    Q    Okay.  She identified that person to you that she was
8    staying with as Miranda; is that correct?
9    A    Yes, that's correct.
10   Q    She indicated to you at that time that Miranda was working
11   as a prostitute, did she not?
12   A    No, she did not say prostitute.
13            MR. BEAVER:  May I have just a moment, Your Honor?
14            THE COURT:  You may.
15   BY MR. BEAVER:
16   Q    The first of these leases is dated July, with a lease
17   beginning on July the 13th of 2012; is that correct?
18   A    Well, there's two here, there's -- July 13th.
19   Q    And the second one was October?
20   A    Yes.
21   Q    Okay.  You are familiar with the physical examination, the
22   medical examination that Victim Number 2 received in January of
23   2013 at Southeastern Regional AHEC in Fayetteville?
24   A    I'm referring to that.
25   Q    I'll draw your attention to page 2 of 6 of that report, if

1    you have it.  I'm sorry, Victim Number 1.  Excuse me.

2    A    Is it Victim Number 1 or Victim Number 2?

3    Q    Victim Number 1.

4    A    Yes, I am.

5    Q    Okay.  On page 2 in that report she indicated to the

6    people examining her at that time that in May of 2012 she had

7    been introduced to Mr. Williams and began to live with him and

8    soon afterward considered him to be her boyfriend; is that

9    correct?

10   A    Yes.

11   Q    And she states that she was sexually active with

12   Mr. Williams, having sex with him frequently; is that correct?

13   A    Yes.

14   Q    All right.  And then about a month after living with him,

15   he said she started -- needed to make some money to help pay

16   for the rent and living expenses, and he had taken pictures of

17   her and made her start prostituting.

18   A    Yes.

19   Q    In the course of your investigation, did you determine

20   that Victims Number 1 and Number 2 had a pre-existing

21   relationship prior to Victim Number 1 meeting Mr. Williams?

22   A    Could you restate that?

23   Q    Yes.  At any time during the course of your investigation

24   did you determine that Victims Number 1 and Number 2 had an

25   existing -- had a relationship between the two of them that had

1   existed prior to Victim Number 1's meeting Mr. Williams?

2   A    They met -- Mr. Williams, the defendant, had known that

3   XXXXXX, Victim Number 1, had been in contact with her on Tagged

4   and he encouraged that he -- or that Victim Number 1 contact

5   Victim Number 2.

6   Q    Did you have occasion during your investigation to read

7   the account of the -- I believe it's the school nurse,

8   Stephanie Lowery, of her interview with the victim in this --

9   Victim Number 1 in this matter?  I'm sorry, Victim Number 2.

10  A    Are you referring to Stephanie Lowery's statement?

11  Q    Yes.

12  A    Okay.

13  Q    Page 1 of that report, I believe it is, or page 2,

14  January 3rd, 2013.

15  A    I have the school social worker but I don't have the

16  school nurse's statement in here.

17          MR. BEAVER:  May I approach the witness, Your Honor?

18          THE COURT:  You may.

19  BY MR. BEAVER:

20  Q    I'll ask you to read this paragraph, the bottom paragraph

21  on page 2 of 4 of the report, if you would, please.  See if

22  that refreshes your recollection.

23  A    She reports she was missing for approximately three weeks,

24  missing a Christmas holiday because she was being held against

25  her will by a 33-year-old male.  She reports that she has a

1   female friend who used to be an intimate lover.  She elaborated

2   that she is bisexual and used to be in a relationship with this

3   female.  She said the friend and her -- and they text each

4   other regularly, and the friend and a man who she thought was a

5   male relative came to pick her up to go hang out at their house

6   for a little while.

7   Q    That's fine.

8   A    Okay.

9   Q    But my point is:  Does this indicate to you that prior to

10  Victim Number 1 meeting Mr. Williams, that she and Victim

11  Number 2 had a prior sexual relationship which pre-existed the

12  relationship of Victim Number 1 and Mr. Williams?

13  A    Well, she says she has a female friend, so I don't know if

14  that's referring to Victim Number 1 or someone else.

15  Q    Well, she reports that she has a female friend who used to

16  be an intimate lover, she elaborated that she is bisexual, used

17  to be in a relationship with this female.  She said the friend

18  and her text each other regularly and that her friend and a man

19  who she thought was a male relative came to pick her up and go

20  and hang out at the house for a while.

21  A    That seems as if it is the victim.

22  Q    Right.  Okay.

23  A    But that is what was told to the school nurse.

24  Q    To the school nurse.

25  A    Um-hum.

1  Q    Do you know when that relationship began and how long it
2  predated the meeting with Mr. Williams?
3  A    I do not.  I know that they had a sexual -- Mr. Williams
4  would have them perform sex together with him, and I know that
5  they were doing that at the time.
6  Q    Do you know if they ever -- if they were ever in a
7  juvenile institution together prior to this --
8  A    I do not know.
9  Q    Never checked that at all to determine --
10 A    No.
11 Q    Okay.  Did you have occasion in the course of your
12 investigation or did your department with your cooperation or
13 supervision have the opportunity to talk with neighbors in the
14 neighborhood, workmen in the apartments, anyone like that,
15 concerning whether or not they had seen these two young girls
16 up and about the apartments that the defendant lived in?
17 A    Yes, I did.
18 Q    All right.  What was the result of what you found out with
19 that?
20 A    I don't recall that individual's name, but he was a
21 workman.  He spoke Spanish, so it had to go through the
22 property manager, but he told the property manager that he had
23 seen both girls coming in and out of Mr. Chris Williams'
24 apartment.
25 Q    All right.  And did he indicate whether or not he saw any

1   signs that those young girls were in distress of any type at

2   all?

3   A    No.

4   Q    All right.  Did you make any efforts to determine whether

5   any allegations of child sexual abuse had been made by

6   Ms. Shirley Williams regarding her two sons, Michael Williams

7   and Christopher Williams, back in 1982?

8   A    I did.

9   Q    All right.  What did you find?

10  A    I have negative results.  I did not find any --

11  Q    You did not find anything at all --

12  A    No.

13  Q    -- from 1982?

14  A    Correct.

15  Q    And of course that would have been ten years prior to the

16  offense that ended up with Mr. McLeod --

17  A    Correct.

18  Q    -- being placed on the sex offender list.

19  A    Correct.  I did check with the sex offender unit and they

20  have extensive files on sex offenders.  They let me look

21  through everything that they had and there was nothing to

22  indicate there were any other victims.

23  Q    And that's of Mr. McLeod; is that correct?

24  A    Yes.

25  Q    All right.  Did you check under the name Anthony McNeil?

1  A    I wasn't made privy to that name.

2  Q    And did you check under the name of Shirley Williams, the

3  mother, or Christopher or his brother Michael?

4  A    Yes.

5  Q    All right.  And you did not find --

6  A    Not under Michael Williams.  I wasn't aware of that.

7  Q    Okay.

8  A    But the Williams last name, there were no reports.

9            MR. BEAVER:  All right.  Thank you.

10           That's all I have, Your Honor.

11           THE COURT:  Thank you.  Anything else?

12           MS. COOLEY:  Your Honor, just briefly.

13                     - - - - -

14                REDIRECT EXAMINATION

15 BY MS. COOLEY:

16 Q    I'm marking the report that you were just reading from,

17 Nurse Stephanie Lowery, I'm going to mark that as Government 17

18 for the record, and with respect to the entirety of that

19 statement, I know that Mr. Beaver had you read part of that,

20 but with regard to the rest of that statement by the school

21 nurse, is it fair to say that the rest of the nurse's statement

22 corroborates the disclosures that Victim 2 gave to you upon

23 coming to the police department?

24 A    Yes, it does.

25           MS. COOLEY:  Your Honor, we offer Government 17 for

1    the record.

2              THE COURT:  It will be received.

3              MS. COOLEY:  I have no further questions.

4              THE COURT:  Anything else from this witness,

5    Mr. Beaver?

6              MR. BEAVER:  No, sir.

7              THE COURT:  All right.  Thank you.

8              Ma'am, you may step down.

9              The United States may call its next witness.

10             MS. COOLEY:  Thank you, Your Honor.  We'd call

11   Detective Chad Smith.

12             THE CLERK:  Please place your left hand on the bible

13   and raise your right hand and state your name for the record.

14             THE WITNESS:  Chad Smith.

15                        – – – – –

16                   **DETECTIVE CHAD SMITH**

17    being first duly sworn, was examined and testified as follows:

18                        – – – – –

19                   DIRECT EXAMINATION

20   BY MS. COOLEY:

21   Q    Thank you.  Detective Smith, how are you employed?

22   A    Cyber crimes detective in the Fayetteville Police

23   Department.

24   Q    How long have you been doing that?

25   A    I've been doing that about nine years.

1   Q    And how did you become involved in this case?

2   A    Received a request from Detective Rosenberg to download a

3   phone.

4   Q    And when you say "download a phone," what generally do you

5   mean?

6   A    Basically what we do is we hook that phone up to a device

7   and with this device it creates a one-way traffic where it

8   downloads the information from the actual device to a folder,

9   creating a copy of the data that's there that you can then

10  build a report from.

11  Q    Does it alter the data from the phone in any way?

12  A    It does not.

13  Q    With respect to this case, were you able to find any of

14  the evidence of the sex trafficking for which you're here

15  today?

16  A    I was.

17  Q    And generally speaking, what did you find?

18  A    There was lots of remnants of conversations, text

19  messages, e-mails, pictures, videos, communications between

20  different persons, unnamed persons, just phone numbers, and

21  like I said, lots of internet activity, to include Back Page,

22  several other websites.

23  Q    Some of those other websites being EroticMugshots.com?

24  A    Yes.

25  Q    And MyProviderGuide.com?

1    A    Yes.

2    Q    Now, when you say the traffic back and forth, did that

3    include negotiations for prices of services?

4    A    It did.

5    Q    And did you find -- you mentioned photographs and videos.

6    Were any of those child pornography or child erotica?

7    A    There were images that I identified as possible child

8    pornography and I had Detective Rosenberg come down and

9    identify the victims, noted their faces and their ages, and

10   through that I identified I believe it was 92 images of child

11   pornography.

12   Q    And that was 92 images that had been created by this

13   defendant?

14   A    Created by someone using that phone.

15   Q    And with respect to the total number of child pornography

16   and child erotica images, what was the total number located on

17   the phone?

18   A    I believe it was 870, but in that mix there was also shots

19   of illegal activity not having to do exactly with child erotica

20   or child pornography, but most of it was either child erotica

21   or child pornography or images of women of undetermined age in

22   sex acts or in various degrees of undress.

23   Q    And were any of the things that you located videos?

24   A    Yes, they were.

25   Q    And with respect to our victims in particular, did you

1   have occasion to review at least four videos involving Victim

2   Number 1?

3   A    I did.

4   Q    I have several of the images for you here today and what

5   I'd like to do is hand them up and see if you can identify them

6   as the videos you downloaded from the phone and have previously

7   reviewed.

8            MS. COOLEY:  Your Honor, if I may approach the

9   witness.

10           THE COURT:  You may.

11           MR. BEAVER:  May we have just a moment, Your Honor?

12           THE COURT:  You may.

13  BY MS. COOLEY:

14  Q    If you would take a moment and look through the content of

15  the red envelope and let me know if you recognize those items.

16  A    I've reviewed them.

17  Q    And that's Government's Exhibits 7 through 15; is that

18  correct?  7 being a video disk and 8 through 15 being

19  photographic images.

20  A    Yes, ma'am.

21  Q    And with respect to these, at least that you can see,

22  Government's 8 through 15, are those images which you have

23  viewed as being downloaded from the defendant's phone?

24  A    They are.

25  Q    And I want to start with Government's Exhibit 7, which is

1   a CD of the videos that were downloaded from the defendant's

2   phone.  Have you viewed this disk today?

3   A    I have.

4   Q    And are those videos in the same condition as when they

5   were downloaded from the defendant's phone?

6   A    They were.

7   Q    I'm not going to play the videos for the Court here today,

8   but I would like for the record you to describe the content of

9   those videos and the nature and circumstances of the conduct

10  that they depict.

11        With respect to videos 1 through 4, if you could

12  describe what those show.

13  A    Video 1 was a 2 minute I think it was 45 second, 2 minute

14  35 second, somewhere between there, clip of the defendant and

15  Victim 1 as identified by Detective Rosenberg, basically the

16  defendant lying on a couch, the Victim 1 straddling on top of

17  him in a reverse kind of situation where her vagina was in his

18  face and his penis was in her face.  Basically they're

19  performing oral sex on each other.  The video showed the

20  defendant apparently holding the camera above his head, in

21  front of him like this and then off to the side to show her

22  performing oral sex on him.

23  Q    And with respect to video 2, what did video 2 show?

24  A    Video 2 was another video of the exact same thing,

25  basically it was about the same length, showed the exact same

1  stuff, mainly showing her anus and vagina while he performed
2  oral sex on her.
3  Q    And at any point in time during these videos if the
4  defendant made any statements, if you would inform the Court of
5  those statements.
6  A    In video 1 there was no audible talking back and forth or
7  words, but instead there was a TV being played in the
8  background, but there was nothing said between the two that I
9  could hear or understand.
10       In the second video, as the video came on I could
11 hear him say "I'm going to make another one" or something to
12 that effect, then nothing else was said.
13       Then in video 3, basically he asks her, "Are you
14 going to get my dick hard?" and she says "yes" and then -- or
15 "Yeah," and then he says, "Well, it ain't hard yet," and it
16 continues from there.
17 Q    And in video 3 what is being depicted while he's saying
18 that?
19 A    Basically it appears that he's either standing up or
20 sitting on something and she is between his legs performing
21 oral sex on him.
22 Q    And with respect to video 4, what does that show?
23 A    Video 4 starts out with her -- Victim Number 1 lying on a
24 bed nude on her stomach with him kind of in between her legs
25 behind her, basically he's asking her to do things and she does

1   the things that he asks.  Basically first he asks her, turn and

2   say hi to everybody, or to everybody out there or something to

3   that effect.  She does that.  He then makes a comment about her

4   buttocks on several occasions.  If I could look at my notes

5   I could read direct quotes, but other than that I can't recall

6   directly what he was saying.

7   Q    If you would read the direct quotes for the Court, based

8   upon your notes.

9   A    Sure.  I'll have to get them.

10        Sorry about that.  It's on video 4, exactly what he

11  said and as a quote, "Look back and say hi."  He says, "Pretty

12  little ass.  Why don't you lean back and let them see your

13  titties.  That's some good looking shit right there.  Go ahead,

14  let me see your tongue.  Play with it."  And then he makes a

15  sound, something with his tongue.  "Oh, yeah, what can you do

16  with that tongue?  Lots of things.  Do you want to show some

17  people?  Do you want to show some people?  Mmmmm.  Turn around.

18  Mmmmm.  Look at that.  Go ahead, roll back over and put this

19  dick in.  Put it in from the back.  Look at that ass.  Hold

20  this."  And then it looks like he drops the camera at that

21  point, it goes blank.

22        MS. COOLEY:  Your Honor, at this time we are prepared

23  to play the video for the Court, if Your Honor would like to

24  see it; otherwise we would move the video into the record as

25  Government's Exhibit 7.

1        THE COURT:  It will be received.  You don't need to

2  play it.

3        MS. COOLEY:  Thank you.

4  BY MS. COOLEY:

5  Q    I want to move on to Government's Exhibit 8, and

6  Government's Exhibit 8 through 15 -- well, first I want to ask,

7  Government's Exhibit 8, what does that depict?

8  A    It is what appears to be a webpage posted on a site,

9  EroticMugshots, depicting what appears to be Victim Number 1

10  holding a piece of paper, a cardboard sign with a phone number

11  and then a name and then with a tie draped across her breasts

12  and then her kind of bent over a little bit showing her

13  buttocks in a pair of underwear.  On the right side is --

14  appears to be a second posting or a split screen of one

15  posting, shows what appears to be Victim 2 in a G-string and a

16  wig bent over on a bed in multiple positions, lying back, and

17  then both of -- the Victim 1 and Victim 2 both in what appear

18  to be G-strings just from the back of the shoulders to about

19  the back of their knees together, and then both of them bent

20  over on a bed, showing about the same area of their bodies.

21  Q    Now, that's an actual screen shot from one of these

22  websites that's present in this case; is that correct?

23  A    That's correct.

24  Q    Downloaded from the defendant's phone?

25  A    That's right.

Q And were you able to observe several other different websites or postings related to this case?
A I was.
Q And were those from BackPage.com, EroticMugshots and also MyProviderGuide?
A Yes, it is.
Q And this particular exhibit, Defendant's Exhibit 8, that's from which website?
A This is from EroticMugshots.
Q Is it generally comparable and similar to other postings that you were able to observe regarding the victims in this case?
A It is. The pictures may be different or in a different order, the girls might be in different clothing, but the general setup is all the same.
Q And with respect to Government's 9 through 15, I want to ask you to describe these images for the Court.
Government's 9 from Indictment Count 4, if you would identify what's depicted in that photograph.
A This is a rearview picture of Victim Number 1 as she is bent over with the front part of her body on the couch, her knees are on the carpet, it's showing her anus and her vagina, with no clothes on from the waist down.
Q And with respect to Government's Exhibit 10 from Indictment Count 5, what does that depict?

1   A    10 shows Victim Number 1 bent over, appears to be in a

2   kitchen, she's got her knees on a pillow and she's holding up a

3   phone number on a piece of paper.  The only thing she's wearing

4   is a G-string, so you can see partial parts of her vagina and

5   her anus.

6   Q    And with respect to Government's Exhibit 11 from

7   Indictment Count 6, what does that depict?

8   A    11 shows Victim Number 1 laid back, appears to be possibly

9   a bed or laying on a bedspread.  She's wearing a pair of

10  underwear but she has them pushed to the side and she is

11  spreading her vagina with her fingers.

12  Q    With respect to Government's 12 from Indictment Count 7,

13  what does that depict?

14  A    Number 12 is a still screen shot of one of the videos,

15  actually video 3, shows Victim Number 1 performing fellatio or

16  oral sex on what appears to be a black male.

17  Q    And Government's Exhibit 13 from Indictment Count 8, what

18  does that depict?

19  A    Number 13 is also from a video and it basically shows what

20  appears to be the defendant giving a thumbs up while Victim

21  Number 1 performs fellatio or oral sex on him, apparently on a

22  couch or some kind of chair.

23  Q    Is the defendant's face visible in that photograph?

24  A    It is, and he's smiling.

25  Q    Government's 14 from Indictment Count 9, what does that

1  depict?

2  A    14 shows Victim Number 2 on the left, Victim Number 1 on

3  the right, both bent over on a bed, showing their buttocks and

4  part of their anus, both wearing very skimpy G-string type

5  underwear.  Victim Number 1 is wearing a blond wig.

6  Q    And with respect to Government's Exhibit 15 from

7  Indictment Count 10, what does that depict?

8  A    Number 15 is Victim Number 2 only wearing the blond wig

9  bent over on a bed with her buttocks high in the air, focusing

10 the picture on her buttocks, wearing a thong that is slightly

11 pushed over, showing her -- part of her vagina and her anus.

12           MS. COOLEY:  Your Honor, at this time we move

13 Government's 8 through 15 as part of the record.

14           THE COURT:  They'll be received.

15           MS. COOLEY:  Thank you.  I have no further questions

16 for Detective Smith.

17           THE COURT:  Cross-examination?

18           MR. BEAVER:  I have no questions, Your Honor.

19           THE COURT:  Did you say no questions?

20           MR. BEAVER:  Yes, sir.

21           THE COURT:  Thank you.  You may step down.

22           Anything else from the Government?

23           MS. COOLEY:  Not as far as the evidence, Your Honor.

24 We are prepared to argue at the Court's pleasure.

25           THE COURT:  Do you have victim allocution you said

1    you wanted to read?

2         MS. COOLEY:  I do, Your Honor, and I can do that at

3    this time if you'd like.

4         THE COURT:  All right.

5         MS. COOLEY:  Your Honor, with respect to the victims

6    in this case, we have been involved with them from the

7    beginning, we've met with them in person, we've talked with

8    them several times on the phone.  It has been an evolving

9    determination as to whether or not they would choose to be here

10   today.  They are still very young, they are both still in

11   therapy and they are both still trying to recover from the

12   damage that this has done.  In light of that, they both chose

13   to write statements and ask that I read them to Your Honor.

14        THE COURT:  Okay.

15        MS. COOLEY:  The first statement I'll read is from

16   Victim Number 2.  She says:  "For me, going through that ordeal

17   and experience really took a lot away from me.  I lost my

18   sister (mentally).  She and I don't really get along that much

19   now.  My sleep has gotten a bit hard because of nightmares

20   about what has happened.  I lost trust from my family that I am

21   currently earning back, because really I had no business

22   getting in the car with him (even though I thought he was a

23   relative of my friend's).

24        "I am horribly afraid of going to court, and truly

25   hope I don't have to go.  I think about it frequently, and

lately very often I have nightmares about going.  It's not a

place I plan on ever going again for anything.  But people have

been very supportive and have helped me a lot, actually ever

since this tragedy, and that makes me feel good.

"I actually don't like talking about my experience

with that particular situation, so usually my family and I

don't discuss it or bring it up very much for my comfort."

Dated September 4th, 2013.

With respect to Victim 2, Your Honor, she wrote her

statement on November 7th of this year, and says:  Dear Judge,

I'm a victim of sex trafficking and here's my story.  I was at

a hotel with my friend and I met her pimp, Ali, and then

parentheses, Christopher, my abuser.  He had drugs on him and

we got high.  He took me to the shower and wanted to have

sex -- and wanted to have sex with me.  I didn't know this guy

so I said no at first.  I felt uncomfortable.  After the tenth

time of him asking me I said yes.  We performed oral sex on

each other and we had sex in the shower.  After that we left

the hotel and he took me to his mom's house.  I stayed there

for four days and got high with him.  He snuck me in at first,

but his mom caught us eventually.  He got an apartment after we

got caught together.  Our relationship was good for about a

month and then it drastically changed.  He wanted me to do this

threesome with this girl I knew.  I didn't want to do it, but I

had to.  I had to watch him have sex with her in my face.

Later that day we took her home and went back to his apartment.
I was very hurt.  This made me not like him as much.  He got
mad at me and said, "You embarrassed me, next time act like you
like it."  When I did the threesome, I looked like I didn't
enjoy it and that's why he yelled at me about that.

She then has a subsection that says, "Ali's Rules for
Prostituting."  When guys come to the door say, quote, pull it
out, and touch my breast to make sure they weren't cops.  We go
upstairs and I'd say "spread the donation."  It was $100 for
30 minutes, $200 for an hour, no anal or bareback, no fetishes,
kissing or touching my genitals.  More positions can be done if
you pay for more time.

Another subsection says "Ali's Phone Rules."  When
clients call, I answer and say, "hi, how are you?  Are you
law enforcement?  What kind of time are you looking for?"  I
wouldn't give clients my address because they could be cops.  I
would give my street name if they needed help getting to my
location.  If I don't do these rules I would get yelled at,
slapped, almost beat to death, kicked, punched or choked.  Most
of the time I'd end up in bruises.

Another subsection, "About Victim 2."

Ali had sex with her and got her pregnant.  I know
this because I felt her stomach and it had a knot in it.  She
was sex trafficked as well and she was forced to; if she
didn't, Ali would take all her money she made and he would have

1    kicked her out.

2         I just want Ali to never get out of jail because I

3    know that he is crazy enough to seek revenge on me, because he

4    said he will kill me if I told anybody this.

5         This trauma has impacted me a lot.  I had to deal

6    with a lot of clients and it was absolutely disgusting.  I see

7    old men as perverts and I can't be in a relationship because

8    I'm insecure and this has made me be more insecure.  Because of

9    me dealing with a lot of clients, I can't be in Fayetteville.

10   That's why I want my family to move, so I can keep them and me

11   safe.  I don't want to end up seeing a client at the mall or

12   store.  I don't want them to stalk me or my family.

13        I assume that my staff members are dating, even

14   though they aren't, and I think about my past when I'm doing my

15   schoolwork.  Sometimes I can't concentrate, and I think a lot

16   about drugs.  This is how much this trauma has affected me.

17   Sometimes I even have terrible nightmares, causing me to cry

18   when I wake up.

19        My self-esteem has lowered a lot since I've been

20   through this.  I think about having surgery sometimes because I

21   feel ugly and worthless.  Living with this has -- living with

22   this man has been absolute hell and I hope no one will have to

23   go through this if he gets out of jail.

24        Sincerely, and then she signs her name, Victim 1.

25        THE COURT:  All right.  Anything else from the

1    Government by way of -- you said you only have argument left?

2            MS. COOLEY:  That's correct, Your Honor, just

3    argument left.

4            THE COURT:  Mr. Beaver, did you want to present

5    anything, other than argument?  I am going to hear argument.

6            MR. BEAVER:  Your Honor, could I suggest a very brief

7    recess so that I can talk with the defendant's family?

8            THE COURT:  Okay.  We'll take a ten minute recess

9    until 2:50.

10                           - - - - -

11            (Recess at 2:39 p.m. until 2:53 p.m.)

12                           - - - - -

13            THE COURT:  Mr. Beaver?

14            MR. BEAVER:  Yes, Your Honor.  We would call

15   Ms. Shirley Williams to come forward, please.

16            THE CLERK:  Please place your left hand on the bible

17   and raise your right hand and state your name for the record.

18            THE WITNESS:  Shirley Williams.

19                           - - - - -

20                      **SHIRLEY WILLIAMS**

21   being first duly affirmed, was examined and testified as

22   follows:

23                      <u>DIRECT EXAMINATION</u>

24   BY MR. BEAVER:

25   Q    Would you state your name, please.

1   A     Shirley Smith Williams.

2   Q     Ms. Williams, what city do you live in?

3   A     Fayetteville, North Carolina.

4   Q     And you are the mother of the defendant in this case,

5   Christopher Williams; is that correct?

6   A     I am.

7   Q     Do you recall when your son Christopher was about

8   four years old where he was babysat?

9   A     Yes.

10  Q     Where was he babysat?

11  A     Georgialeen Autry.  She was the youth leader of my church.

12  Q     And during the period of time -- how long did Ms. Autry

13  babysit for you?

14  A     From six months to about a year.

15  Q     And who did she babysit for?

16  A     Christopher, John and Michael Williams.

17  Q     All right.  How old was John at that time?

18  A     Nine.  Christopher was four and Michael was three.

19  Q     All right.  You've prepared a letter for Judge Dever which

20  has been submitted along with a motion in this matter; is that

21  correct?

22  A     Yes, sir.

23  Q     Have you had a chance to completely review that letter?

24  A     Yes, sir.

25  Q     And are the matters and things that were stated in that

1   letter the truth?

2   A    Yes, sir.

3   Q    Specifically, did there come a time when you reported to

4   the Fayetteville Police Department that your sons Christopher

5   and Michael had been sexually abused?

6   A    Yes, sir.

7   Q    Can you tell me approximately when that was?

8   A    It was '84.

9   Q    Okay.  Around '84?

10  A    Yes, sir.

11  Q    Is that correct?

12  A    Yes, sir.

13  Q    And what did you tell the Fayetteville Police at that

14  time?

15  A    I told them that they had said that -- I was giving them a

16  bath and they were sore, and they said that they had been

17  sexually molested after I questioned them.

18  Q    Did you take your boys to a physician?

19  A    Yes, sir.

20  Q    And do you recall who that doctor was?

21  A    It was Fort Bragg.  We were military.

22  Q    Okay.  So are those records available to you any longer at

23  this time?

24  A    I don't know.

25  Q    Where did you go to the Fayetteville Police Department to

1   report this?

2   A    I called them and a detective came out.

3   Q    And did you talk with the detective?

4   A    Yes.

5   Q    And did you have your boys talk to the detective?

6   A    Yes, sir.

7   Q    What finally came of that allegation, of that account?

8   A    He said that he brought Anthony in and he passed a lie

9   detector test, and I told him they know who he is, they've

10  known him for years, and I wanted something done about it.

11  He said, "Do you really want to put your boys through that?"

12  I said "Yes."  And he said, "Well, they're going to put them on

13  the stand and ask them, do you believe in Santa Claus, and once

14  they say yes, they're going to say, see, there's no Santa

15  Claus, these boys are lying," and I didn't want to put my kids

16  through that.

17  Q    When you say the detective told you they gave Anthony a

18  lie detector, who was Anthony?

19  A    He was the molester, one of them.

20  Q    All right.  Were there two?

21  A    Yes, sir.

22  Q    What were their names?

23  A    Wayne McLeod and Anthony McNeil.

24  Q    And changing the subject for a moment, did you have

25  occasion to find a young woman in your house who was uninvited

1  in the spring of 2012?

2  A    Yes, sir.

3  Q    Could you explain to the Court about that, what occurred.

4  A    I heard someone upstairs in my house.  My sister had --

5  Ms. Gilbert had told me that I was at work and that she heard

6  someone in my house.  I laughed.  I thought she was kidding.  I

7  got home and I also heard the noise, and I went upstairs, and I

8  asked her to come out, whoever is in there, I'm going to call

9  the cops; then she came out.  It was a young lady, Victim 1.

10 I took her downstairs to my bedroom and I sat there and I

11 talked to her and I asked her, "How old are you?"  She said 18.

12 I said, "Are you sure?  You don't look 18 to me."  She said,

13 "Yes, ma'am, I'm 18."  I said, "Well, what are you doing in my

14 house?"  She said, "Chris invited me here."  I said, "This is

15 my house.  He has no right to invite you here.  Where are your

16 parents?"  She said her parents didn't want her and that she

17 had aged out of the group home, and I have hired a girl in my

18 salon that aged out of a group home, so I believed her.

19 Q    What type of work do you do?

20 A    I own a barber shop and salon.  Barber shop and salon.

21 I'm a barber.

22 Q    And where do you work?

23 A    5411 Ramsey Street, Fayetteville, North Carolina.

24 Q    And how long have you done that type of work?

25 A    28 years.

1    Q    Okay.

2    A    I've been in business 25.

3    Q    All right.  And did you raise your sons by yourself; is

4    that correct?

5    A    Yes.

6    Q    Did you and your husband divorce?

7    A    We did.  When Mike was a year old we were divorced.

8    Q    When he was a year old?

9    A    Yes, sir.

10   Q    How long did the girl stay at your house?

11   A    A couple of days.

12   Q    By "a couple," do you mean approximately two days?

13   A    Yes, sir.  I told Christopher -- after talking to the

14   girl, I was upset that her parents could want nothing to do

15   with her.  I wanted to go and talk to the parents.  I was real

16   upset, how can you do that, to throw your daughter out and not

17   want her?  And when Christopher got home from work, I talked to

18   Christopher, and he told me he had met the girl and he was

19   trying to help her.  I told him he couldn't live with a woman

20   in my house.  At that time I thought she was 18, but I don't

21   care if she's 40, she can't live in my house with my son.

22   Q    Did there come a time after that that your husband -- I'm

23   sorry, your son Christopher and this Victim Number 1 moved out

24   of your house?

25   A    He got an apartment the next day and they moved out the

1    day after that.

2    Q    All right.

3    A    Second day.

4    Q    So from the time that you found her in your house until he

5    got the apartment and moved out was approximately three to four

6    days; is that correct?

7    A    No, sir, it was a couple of days.  I put her in the guest

8    room.  She had to come out of his room and go to the guest

9    room.

10   Q    All right.  Where did he move to?

11   A    He moved behind McDonald's in an apartment complex.  I

12   don't know the name of it.  I think it's Woodley or something.

13              MR. BEAVER:  Your Honor, may I please see --

14   I believe it's Government's Exhibit Number 6, I believe, which

15   is the initial lease.

16   BY MR. BEAVER:

17   Q    Was this a house located on Wichita Drive in Fayetteville?

18   A    Yes, sir.

19   Q    All right.  I'll show you what the Government has admitted

20   as the lease to those premises and point out to you the date of

21   that lease was July the 13th of 2012.

22   A    Yes.

23   Q    All right.  Was that the date that your son moved in --

24   A    Yes, sir.

25   Q    -- to that apartment?

1    A    Yes, sir.

2    Q    And he had been with this young girl in your house for

3    only two days prior to that?

4    A    Yes, sir.

5    Q    Okay.  Did you ever have occasion to visit Victim Number 1

6    and the defendant while they were in either one of the two

7    apartments that they lived in until December of --

8    A    Yes, sir.

9    Q    -- 2012?

10   A    Yes, sir.

11   Q    Would you explain to the Court the interaction that you

12   personally observed between your son and Victim Number 1 during

13   that period of time.

14   A    They were happy.  I thought they were just roommates.  He

15   told me that he had a roommate, and I thought they were

16   roommates, and she seemed happy.  She was the one I interacted

17   with.  Christopher tried -- always tried to avoid me because he

18   felt I was hard on him, but I had interaction with her.

19   Whenever I called the apartment to talk to Chris, she would

20   answer the phone, she always had the phone; and sometimes I

21   would go to drop Chris off because his car needed repair, she

22   would ride with me to drop him off at work and then I'd drop

23   her back off at the apartment.

24   Q    And you saw her off and on at various intervals from July

25   of 2012 until December of 2012?

1    A    Yes.  When they moved to the second apartment, she was --

2    she was making fun of me, laughing and making fun of me because

3    I couldn't find Wind Hill Drive and she thought that was very

4    funny and was calling me dumb because I couldn't find it and

5    she couldn't believe I couldn't find it.

6    Q    During that period of time were you ever alone with her

7    for any extended periods of time?

8    A    Yes, sir.  Yes, sir.

9    Q    Did she ever express any concerns with you about her

10   safety or the fact that she was being physically abused in any

11   manner?

12   A    No.  She was always happy.

13   Q    Did y'all ever talk about the relationship between her son

14   and you?  I mean your son and her.

15   A    No.  I gave her a bed with the mattress and all so she

16   would have her own room.  I just -- I thought she was his

17   roommate, that's what I was led to believe.

18   Q    Turning back again, over the years after your son was

19   physically abused by these two -- by the way, what was her

20   relationship with these two men, Anthony McNeil and Wayne --

21   A    They were -- Wayne was Anthony's uncle, but they were like

22   a couple of years apart in age.

23   Q    All right.  What effect, from your observation of your son

24   over the years, did this sexual abuse have on him?

25   A    I started him off with a therapist, and she was telling

1   him that he had the right to say no to anyone, and he got very,

2   no, no, no, so I took him out of therapy because I thought he

3   was headed in the wrong direction, saying no to authority, and

4   he couldn't hold a bowel movement, he had hemorrhoids really

5   bad.  Even now he has hemorrhoids.  He had a hard time fitting

6   in.  Kids would make fun of him because he wore sweats instead

7   of jeans because he didn't want anything to rub on that area,

8   so they were more comfortable for him instead of the jeans, so

9   they would make fun of him because he wore sweatpants.

10  Q    What is your son's work history like?

11  A    He's always worked hard.  He's gone to several schools.

12  He went to ECPI in Raleigh and he went to the military and he

13  also went to cable school out of FTTC.  He always worked long

14  hours.  I would see him come home at eleven o'clock and go back

15  up to Olive Garden or wherever he was working and he'd sit

16  there and beg someone to let him work because he had a bill

17  come due and he needed to work, and I would say, "Chris, don't

18  go up there begging like you need to work like that."  He said,

19  "Well, mom, I got some bills, I got to pay them."  And I've

20  seen his foot is raw on the bottom and they're really messed up

21  from working 12, 14 hour days.  He's always been a hard worker.

22  Q    Was there a period of time while your son and Victim

23  Number 1 were together that he was employed with Cheddar's

24  Restaurant?

25  A    Yes.

1    Q    On McPherson Church Road in Fayetteville?

2    A    Yes, that's when I would pick him up and drive him to work

3    and she would ride along with me and then I would drop her back

4    off.

5    Q    Why were you driving him to work?  What was the matter

6    with his car?

7    A    It needed to be repaired.

8              MR. BEAVER:  All right.  I think that's all the

9    questions I have, Your Honor.

10             THE COURT:  Thank you.

11             Cross-examination?

12             MS. COOLEY:  Yes, Your Honor.  Thank you.

13             Good afternoon, Ms. Williams.

14             THE WITNESS:  How are you doing?

15             MS. COOLEY:  Good, thank you.

16                            - - - - -

17                      CROSS-EXAMINATION

18   BY MS. COOLEY:

19   Q    I want to start off by asking, you say that in talking

20   about the abuse of your boys, Michael was three at the time and

21   Christopher was four; is that correct?

22   A    Yes.

23   Q    And Michael is the other person who wrote a letter on

24   behalf of the defendant; is that right?

25   A    Yes.

1   Q     And when they told you about the abuse, when you found out

2   about it, what words did they use to describe what had happened

3   to them?

4   A     They told me that they had been locked in a room, and my

5   oldest son told me, he said, "Mom, they were locked in the room

6   and I was outside playing and I came in and I heard them

7   screaming, and I asked Anthony to let my brothers out of that

8   room and he made me go back out and play."

9           And Chris, something he said to me that hurts to this

10  day, he said, "Mama, I told Anthony to stop, it was hurting.

11  He just wiped the blood and kept going."

12  Q     And he told you that when he was four?

13  A     Yes.  He said -- I got home from work and he said, "Mama,

14  I wanted you to come and you didn't come.  I wanted you to

15  come."  And that just -- those two statements just -- to this

16  day it bothers me that every minute seemed like an hour to him

17  and I didn't come when he needed me, I wasn't there.

18  Q     And your oldest son John, he didn't write a letter

19  detailing this abuse to the Court; is that correct?  John did

20  not write a letter talking about this abuse to the Court; is

21  that right?

22  A     I think -- I don't know.  I know Michael -- I didn't talk

23  to Chris about it because he had a hard time dealing with it

24  and we just -- I prayed, and some members of my church said,

25  well, maybe -- we'll ask God to let him forget, and mentally I

1   didn't think he could handle it so I didn't discuss it with

2   him, then when this happened, I talked to Michael about it

3   and -- my three -- the one that was three, he said, "Mom, I

4   remember it.  I remember it vividly.  If I remember it, Chris

5   remembers it," and --

6   Q    Now, you recall previously testifying for the grand jury

7   in this case; is that right?

8   A    Um-hum.

9   Q    And while there you also told the grand jury that Victim

10  Number 1 was not the only girl that he brought by your house;

11  is that right, he also brought another girl by your house?

12  A    Yes.  He brought his girlfriends by to meet me.

13  Q    And isn't it true that when I asked you at that point in

14  time whether you had discussed this case with your son,

15  Christopher, that you told him not to talk about it on the

16  phone because the jail calls were being recorded?

17  A    Um-hum.

18  Q    If you could answer out loud.

19  A    Yes.  Yes, I told him not to discuss the case with me over

20  the phone.

21  Q    And isn't it also true when you and I were talking about

22  that day with the moving truck that Detective Rosenberg located

23  Victim 1 in Christopher's attic --

24  A    Um-hum.

25  Q    -- that when you were referring to her, you referred to

1    her as a girl and again as a girl and several times also as a

2    child; is that right?

3    A    No.  I referred to her as a girl because I -- she

4    convinced me she was 18.  To me an 18-year-old is a girl.

5    Chris was 33 and to me he's my boy.

6    Q    So do you not recall telling the grand jury:  "Because as

7    a mom I would be going through hell not knowing where my child

8    is, so if you know where the child is, you tell her"?

9    A    Yes.  He's my child and anyone who you gave birth to will

10   always be your child, no matter what age.

11   Q    And so when you kicked them out of your house after you

12   found her there with him, that was pretty much immediate, you

13   found her one day and then the next day you made them move out

14   of your house?

15   A    No, I found her that afternoon when he was at work, I

16   talked to him about it when he came from work, he went out that

17   next day, he found an apartment, and then that second day he

18   moved.  I put her -- I went out and bought food for her, trying

19   to make her comfortable, and I told her, I said, come out of

20   the room if you need something, ask me for it, because I felt

21   sorry for her, I thought her mama didn't want her, and I've

22   always wanted to open group homes for -- I even had a name,

23   Safe Child, because I wanted to help.

24   Q    Isn't it true that you thought something wasn't right,

25   this was a child, in your mind, that her mother didn't want

1  her, and she was with your 33-year-old son who is a man?

2  A    She's 18 and he said he was helping her.  I was always

3  happy for my kids to help someone.  But I wanted to talk to her

4  parent, because I would be there for my child.  They could

5  never do something where I would just give up on them, and I

6  wanted to ask her mother how could you give up on your child.

7  She told me her parents had given up on her.  You shouldn't do

8  that.

9  Q    And when you went to help them move out, it's true that he

10 told you that he was moving to Florida, correct?

11 A    Pardon me?

12 Q    When you went to help your son Christopher move out of his

13 apartment, he told you he was moving to Florida, correct?

14 A    He told me he was going to move in with me, and I was

15 going to help him move in with me, and then he said he would

16 stay there and he wanted to move to Florida eventually.

17 Q    When he was moving out, did you know the detectives had

18 been by his house just days earlier?

19 A    I knew that he had been arrested days earlier because

20 Victim Number 1 called me and begged me to go and get him out

21 of jail.  I was embarrassed because I do a lot of police

22 officers' and judges' and attorneys' hair.  I didn't want to go

23 there.  I didn't want them to make a connection that my child

24 was committing a crime.  I've always tried to be an upstanding

25 member of society.  So I asked my sister to go and bail him

1    out, after Victim Number 1 called me and said, please, go and

2    get him, he's arrested.  I was trying to get her to tell me

3    why, and I asked my sister that was living with me to go and

4    get him.  I wouldn't go.

5    Q    And which sister was that?

6    A    Idell Van-Tol.

7    Q    And she actually wrote a letter, not one that's before the

8    Court here, but she wrote a letter to another judge,

9    Judge Scott, on behalf of your son; is that right?

10         MR. BEAVER:  That was Judge Dever.  She got his name

11   wrong.

12   Q    She also wrote a letter?

13   A    Um-hum.

14   Q    And that letter, did you have a chance to read it?

15   A    No.

16   Q    Let me ask you this.  You didn't mention this abuse to

17   Detective Rosenberg or any other detective; is that right?

18   A    I had no reason to.  I mean, he was being -- what he was

19   being arrested for was -- had nothing to do with the abuse.  I

20   didn't know until I was in here when he pled guilty and then

21   the Judge said is there any mental abuse or psychological

22   problems with him, that's when my eyebrows were raised, after

23   what the Judge said before sentencing, he wanted to know if

24   there were any abuse.  I didn't even think about it until the

25   Judge at his plea deal said that.

1    Q    And we were here for the plea agreement -- I'm sorry, for

2    arraignment, we were here July 15th of this year; is that

3    right?

4    A    Um-hum.  That's when -- after the Judge asked about any

5    abuse, that's when it -- two and two became four.

6    Q    And after that as a part of preparing for today's

7    sentencing hearing, probation came and interviewed you to

8    confirm the information that Christopher had given them for

9    what we call the PSR, the presentence report; is that right?

10   A    Um-hum.

11   Q    And they asked you a bunch of questions about his history

12   and his family and asked you to just confirm that all of those

13   answers that he had given were correct; is that right?

14   A    That was before the hearing.  Yes.

15   Q    That was before the hearing?

16   A    Yes, because she called me for pretrial release, thinking

17   he was going to come home.

18   Q    Now, I'm not talking about pretrial release.  I'm talking

19   about the Probation Department --

20   A    No.

21   Q    -- called you.

22   A    No.

23   Q    Richard Whitaker.

24   A    No.

25   Q    Probation Officer Richard Whitaker didn't call you?

1    A    No.

2    Q    He did not?  So if he listed in his report that the family

3    information was verified by the mother, Shirley Williams, by

4    the pretrial investigation, then that would not be an

5    accurate --

6    A    Pretrial, yes.  Yes.  Pretrial release.  That's the only

7    person I talked to, and that was a female, that wasn't a male.

8    Q    So whenever you talked to Probation, you didn't report to

9    them at all that there was any abuse?

10   A    It was pretrial release.  I didn't make a connection until

11   I got here for the plea and the Judge asked about the abuse.

12   It didn't -- I had no reason to say anything to anyone because

13   that wasn't why he was being arrested.

14   Q    And Ms. Williams, based upon your life experience and the

15   experience you've had with your children and raising your

16   children and in your community, is it your testimony that to

17   you it was normal that a 33-year-old man would have an

18   18-year-old runaway girl as a roommate and that was okay with

19   you?

20   A    Let me explain this.  Chris called me when he was about 15

21   and he said, mom -- because I've always helped, I organize a

22   program to feed the homeless in our neighborhood and I took my

23   kids with me, and I said, "If you smell them, don't even say

24   it.  I'd rather for you to treat them like you would President

25   Bush."  So I've always helped, and he called me, and he was

1    about 15, and he said, "Mom," he said, "I found this girl, she

2    has noplace to go."  He said, "I told her my mom won't leave

3    you on the street, you can come home with me."  So we've always

4    helped.  No, I wasn't surprised, because I thought he was

5    helping her.

6              MS. COOLEY:  I have no further questions.

7              THE COURT:  Thank you.  Anything else?

8              MR. BEAVER:  No, Your Honor.

9              THE COURT:  Thank you, ma'am.  Please watch your step

10   stepping down.

11             MR. BEAVER:  Ms. Linda Oliver, please.

12             THE CLERK:  Please raise your right hand and state

13   your name for the record.

14             THE WITNESS:  Linda Oliver.

15                          - - - - -

16                       **LINDA OLIVER**

17   being first duly sworn, was examined and testified as follows:

18                          - - - - -

19                    DIRECT EXAMINATION

20   BY MR. BEAVER:

21   Q    Would you state your name, please, ma'am.

22   A    Linda Oliver.

23   Q    What city do you live in?

24   A    In Fayetteville.

25   Q    Are you married, Ms. Oliver?

1   A    I'm a widow.

2   Q    All right.  How many years were you married prior to being

3   a widow?

4   A    39 and a half years.

5   Q    I'm sorry.  Do you have children?

6   A    Yes, I have two boys.

7   Q    All right.  And how old are your boys?

8   A    They're 38 and 40.

9   Q    I want to draw your attention to an occasion about

10  30 years ago.  Do you know Idell -- I'm sorry.  Do you know

11  Shirley Williams?

12  A    Yes.

13  Q    How long have you known Ms. Williams?

14  A    I want to say about 40 years.

15  Q    Are you friends?

16  A    Yes.

17  Q    Are you good friends?

18  A    Very good friends.

19  Q    Do you confide in one another?

20  A    Yes.

21  Q    About 30 years ago do you remember a conversation that you

22  had with Mrs. Williams regarding her two boys, Michael and

23  Christopher?

24  A    Yes, I do.

25  Q    All right.  Can you relate that conversation for the

1   Judge, please.

2   A    We were talking on the phone and she told me, she said,

3   "Linda," she said, "the boys have been molested," and I was

4   asking her how did she know that.  She said, well, she was

5   trying to give them a bath and they were complaining, and that

6   they had told her that Wayne and Anthony, Georgialeen's boys,

7   they had molested them, because Georgialeen was the babysitter

8   and we were all good friends, and we cried together on the

9   phone that night.

10          MR. BEAVER:  Okay.  That's all the questions I have,

11  Your Honor.

12          THE COURT:  Thank you.  Any Cross?

13          MS. COOLEY:  No, Your Honor.

14          THE COURT:  Thank you, ma'am.  Please watch your

15  step.

16          MR. BEAVER:  I'd like to call John Williams, please.

17          THE CLERK:  Please raise your right hand and state

18  your name for the record.

19          THE WITNESS:  John Williams.

20                      - - - - -

21                   JOHN WILLIAMS

22  being first duly sworn, was examined and testified as follows:

23                  DIRECT EXAMINATION

24  BY MR. BEAVER:

25  Q    Would you state your name, please?

1   A    John Williams, Jr.

2   Q    Mr. Williams, where do you reside?

3   A    I live in Angier.

4   Q    Angier, North Carolina?

5   A    Yes.

6   Q    What type of work do you do?

7   A    I'm a nuclear security officer.

8   Q    And where are you a nuclear security officer?

9   A    Shearon Harris.

10  Q    How long have you worked there?

11  A    Seven plus years.

12  Q    You're Christopher and Michael's brother; is that correct?

13  A    Yes.

14  Q    What can you tell the Court about the abuse of your

15  brothers back when they were four and five years old?

16  A    It's a very sensitive discussion.  I was approximately

17  about seven or eight years old.  Ms. Mina, that's Georgialeen

18  Autry.

19  Q    Georgialeen?

20  A    Yes.  Her and my mother were very good friends.  She had

21  two other boys, they were around my age.  A lot of times the

22  three of us would go out and play, and my brothers, Christopher

23  and Michael, would be left in the house.  This one time in

24  particular I remember I guess my brothers and I was getting

25  kind of rowdy playing, and I remember he took my brothers in

1  the room, and I went and banged on the door and he refused to
2  open the door.  It's something that we never -- very rarely
3  discussed because it's always a sensitive -- it was always a
4  sensitive subject, about the abuse.
5          I remember going to my mother, we were staying at --
6  I can't remember the name of the -- but I remember we were
7  staying in a house and my mother was -- we were getting ready
8  for church, as a matter of fact, and I remember her pulling me
9  to the side with my two other brothers and she's talking to me
10 and she's telling me that we won't be going back over there
11 anymore, and I didn't fully comprehend or understand why, and
12 then she told me what he had done to my brothers.
13 Q    Would it be fair to say that you felt guilty because of
14 what had happened to your brothers?
15 A    Yes.  It's a burden I still carry, because I wasn't there
16 to protect my brothers.
17 Q    Has this been kept as a family secret for all of these
18 years?
19 A    Yes.  Yes, it was.
20 Q    Do you think it's affected your family?
21 A    I know it has.
22 Q    In what ways?
23 A    My brothers and I has always been close, for the most
24 part, but as we grew older, me as a man, I'm realizing that we
25 have a lot of unresolved issues.  Some of it is guilt.  Like I

1    said, I to this day still carry the burden that I wasn't there

2    to protect my brothers.  I always wished I could.  So with that

3    coming up, we just learned to protect ourselves, in a sense,

4    and the older we got, the more it seemed as though we started

5    taking our own paths, one, two, I guess found our own way of

6    coping or handling things.  We never got therapy, we just tried

7    to handle it the best way we knew how, so we just didn't talk

8    about it in a sense.

9    Q    John, did there come a time in 2012 when you came to know

10   what has been referred to in the courtroom as Victim Number

11   1 --

12   A    Yes.

13   Q    -- in this case?

14   A    Yes.

15   Q    Where did you get to know her?

16   A    I got to know her from her residing with my brother.

17   Q    And where did you see her residing with your brother?

18   A    The first I think was called Ponderosa Apartments behind

19   McDonald's, right next to Foxfire neighborhood, subdivision.

20   Q    And did you see her in the other apartment too?

21   A    Yes, I did.

22   Q    Can you explain to the Judge the interactions that you saw

23   going on between Victim Number 1 and your brother Christopher?

24   A    It seemed to be happy interactions.  I remember my mom

25   sent me over there one time to actually help him move in, but

1   by the time I got there he was pretty much done.  There was

2   another time I was in the vicinity, I think I just left my

3   mom's house, and I went by to check on Chris just to see how he

4   was doing, and he was at work and she came to the door, she

5   said he wasn't here, and I said, just tell him I came by.  Then

6   the other two interactions was at the other apartment.

7   Q    Can you describe the last interaction you had with her?

8   A    The last interaction I had with her, I was over to the

9   house, or, excuse me, over to the apartment to help him move,

10  and --

11  Q    Prior to that was there a conversation you witnessed

12  involving yourself, Victim Number 1 and your brother

13  Christopher about another girl who had been staying at the

14  place, Victim Number 2?

15  A    I met a girl.  They were playing video games.  That was

16  the day my mom sent me by there to take him some clothes for a

17  job interview.  They were playing video games, laughing and

18  joking going on.

19  Q    Okay.  When the policeman came over in December of 2012

20  and your brother was arrested, were you at the residence that

21  day?

22  A    No.  The day I was at the residence was in January,

23  I believe it was January 8th, when two detectives came and

24  started asking questions about a missing -- a missing

25  individual, a missing girl.

1    Q    All right.  Is this the day the girl was discovered up in

2    the attic?

3    A    Yes.

4    Q    All right.  Did you go to the attic and actually crawl up

5    there and discover her up there?

6    A    I did.

7    Q    Were you trying to help the police at that time?

8    A    Yes, I was.  The day was kind of stressful.  My brother

9    and I had just had an argument about the moving truck, but then

10   I noticed two police cars coming up and two female detectives

11   exit the vehicles, and they started asking Chris questions and

12   started asking me a couple of questions and my mother a couple

13   of questions, and I remember that she was talking to my mother

14   about a missing girl and she had the picture, and I walked over

15   and I saw the picture and the detective asked me, "Have you

16   seen this girl?"  I said, "no," and then she asked me was there

17   a girl in a house.  I said, yeah, there was a girl in the

18   house, but it wasn't the individual in the picture.  The girl

19   that was at the residence, she was on the slim side; the girl

20   in the picture was heavier, longer hair, straighter hair.  So

21   no, I didn't make a reference between the two.  I didn't think

22   it was the same individual.

23   Q    What caused you to go in the house and find the girl in

24   the attic crawlspace?

25   A    Upon questioning Chris and asking us to help and this,

1  that and the next, the comment was made by one of the

2  detectives saying that we're not concerned with your brother,

3  the only thing that we're concerned with is getting the girl

4  back.  If you help us find the girl then we'll let your brother

5  go.  Okay.  Why not.  I mean, it's helping them and it's

6  helping my brother at same time.  See, it was -- it was in

7  question that the attic or the crawlspace had been tampered

8  with and that the girl could possibly be up there.  I want to

9  say one of the detectives looked but they wasn't tall enough to

10 actually look in there, so I took it upon myself when the

11 detectives helped me up and I looked in there and actually got

12 in there and looked around, at first I didn't see her but then

13 I noticed that someone was laying there, and I looked down at

14 the detective, I said, yes, you know, over there, and she told

15 me to come down and I came down.  She said, "What did you see?"

16 I said, yes, there was someone laying in the corner over there,

17 very flat, I could barely see them.

18 Q    Did she appear to be hiding there to you?

19 A    Yes, it appeared she was hiding.

20 Q    Was she trying to avoid being seen?

21 A    Yes.

22 Q    And then I believe the police indicated they had called

23 some firemen to get her out and you went outside --

24 A    Correct.

25 Q    -- of the residence; is that correct?

1  A    Yes.

2  Q    All right.  In any of the time that you saw the young

3  woman or girl on the premises or had conversation with her, did

4  she in any way seem to be in distress to you?

5  A    Not at all.  I remember one time we went grocery shopping,

6  I went over there and we all went grocery shopping, we had to

7  get groceries.  We went to -- it was Food Lion, as a matter of

8  fact, and I remember her and Chris split up, went on different

9  aisles.  So, no, she didn't seem like she was in fear of her

10 life or in distress or anything.

11 Q    Do you recall if she ever told you her age?

12 A    No.  It never became a question.

13 Q    Never came up?

14 A    No.

15       MR. BEAVER:  All right.  That's all I have,

16 Your Honor.

17       THE COURT:  Thank you.

18       Cross-examination?

19       MS. COOLEY:  Thank you.

20                      - - - - -

21              CROSS-EXAMINATION

22 BY MS. COOLEY:

23 Q    Mr. Williams, you and I have met before?

24 A    Yes, ma'am.

25 Q    You also testified at the grand jury.

1   A    Correct.

2   Q    And you told me then that you got up in the crawlspace.

3   A    Correct.

4   Q    And that's when you located Victim Number 1, correct?

5   A    Correct.

6   Q    Now, how did you get up there?

7   A    One of the detectives helped me up.  At first she was,

8   I think, trying to lift me up, couldn't do it, so we went and

9   got a nightstand, I think, and that's how I got up there.

10  Q    And how tall are you?

11  A    Five ten and a half.

12  Q    So you're pretty tall.

13  A    Average height.

14  Q    And fair to say you couldn't get up in that crawlspace by

15  yourself?

16  A    No.

17  Q    Somebody had to put you up there?

18  A    Well, I had to use a nightstand to get up, yes.

19  Q    And you work security in nuclear plants, right?

20  A    Correct.

21  Q    Do you ever do any investigations as a result of that?

22  A    Minor.

23  Q    But you went to college?

24  A    Some college.

25  Q    Okay.  And so you're a pretty smart man?

1  A     I like to think so.

2  Q     And when your brother went in the house that afternoon and

3  locked the door and the girl that you saw in that house ended

4  up in the crawlspace, up in the attic, you mean to tell me that

5  you didn't know that something was wrong at that point?

6  A     At that time -- my brother has a tendency where if he

7  feels like his back is against the wall, he tends to push back,

8  so that day I learned that I guess two police officers had came

9  by before and he felt as though he was treated unfairly, so

10  that's the reason for the pushback.  And as far as the girl

11  being up in the attic, yeah, I didn't think that was right.

12              MS. COOLEY:  I have no further questions.

13              THE COURT:  Thank you.  Anything else?

14              MR. BEAVER:  No, sir.

15              THE COURT:  Thank you.  Please watch your step

16  stepping down.

17              MR. BEAVER:  Ms. Idell Van-Tol, please.

18              THE CLERK:  Please place your left hand on the bible

19  and raise your right hand and state your name for the record.

20              THE WITNESS:  Idell Van-Tol.

21                          - - - - -

22                       **IDELL VAN-TOL**

23  being first duly sworn, was examined and testified as follows:

24                          - - - - -

25

1                    DIRECT EXAMINATION

2    BY MR. BEAVER:

3    Q    Would you state your name, please.

4    A    Idell Van-Tol.

5    Q    And, Ms. Van-Tol, where do you live?

6    A    I live in Maryland right now.

7    Q    And do you have roots in Fayetteville, North Carolina?

8    A    Yes.

9    Q    How many years did you live in Fayetteville?

10   A    About 30 some, 30 plus.

11   Q    And you are the sister of Shirley Williams; is that

12   correct?

13   A    Yes.

14   Q    And you are the aunt of Christopher Jason Williams; is

15   that correct?

16   A    Yes.

17   Q    You wrote a letter to the Judge on behalf of Christopher?

18   A    Yes.

19   Q    Is that correct?

20        Were the things that were contained in that letter

21   truthful?

22   A    Yes, it was.

23   Q    In all respects?

24   A    Yes, in all respects.

25   Q    Very briefly, would you just describe the relationship

1   that you saw between Victim Number 1 and Christopher Jason

2   Williams.

3   A    Well, I thought it was a friendship, you know, I thought

4   it was just he was helping her, you know, like a buddy kind of

5   thing, because they'd laugh and joke and, you know, because I

6   would be around them, I saw them interact, and I thought it was

7   like just buddies, you know, they was just kidding around,

8   you know, because they had me laughing too.

9   Q    How many times did you see her between July of 2012 and

10  January of 2013?

11  A    I saw them on many occasions, because I took them by the

12  house, I took them to the store, I took them -- I took his car

13  to get fixed, and I called -- every time I called she answered

14  the phone and she would say he's not there or she won't answer

15  the phone or she'll answer it and just hang up.

16  Q    During the periods of time that you would call on the

17  telephone, who would answer?

18  A    She always answered.  I never -- Chris never answered.  I

19  always said, every time I spoke to Chris, you know, sometimes

20  when -- I asked why she had his phone.

21  Q    And did you have occasion where you would be alone with

22  this young lady?

23  A    Yes.  I would be alone when I'd take the two of them to

24  the store, Chris would go to the store and she would be in the

25  car.  I even asked her did she -- Chris would be in the store,

1    she sat in the car a lot, and I said, do you want me to take

2    you somewhere so we can get you some food, and she said, no,

3    she don't have a Social Security card, I.D.  I said, "Where is

4    it?"  She said, "It's at home."  I said, "Do you want me to

5    take you to get it?"  And she said, "No, no, I just don't want

6    to bother."

7             Another occasion she was in the car and I took --

8    followed Chris to his car to get his car fixed and she was

9    right there and I was asking her, are you okay, you know, how

10   is everything going, you know, me and her carried on

11   conversation, and I never thought -- ever thought nothing was

12   wrong with her.  She never seemed distressed.  She was always

13   in a bubbly mood.

14             MR. BEAVER:  Okay.  That's all I have, Your Honor.

15             THE COURT:  Thank you.  Any Cross?

16             MS. COOLEY:  No, Your Honor.  Thank you.

17             THE COURT:  Thank you, ma'am.

18             MR. BEAVER:  Thank you, Your Honor.

19             I'd call Michael Williams to the stand.

20             THE CLERK:  Please raise your right hand and state

21   your name for the record.

22             THE WITNESS:  Michael Justin Williams.

23                         - - - - -

24

25

| | |
|---|---|
| 1 | **MICHAEL WILLIAMS** |
| 2 | being first duly affirmed, was examined and testified as |
| 3 | follows: |
| 4 | - - - - - |
| 5 | DIRECT EXAMINATION |
| 6 | BY MR. BEAVER: |
| 7 | Q    Would you state your name, please. |
| 8 | A    Michael Justin Williams. |
| 9 | Q    Mr. Williams, what city do you live in? |
| 10 | A    Atlanta, Georgia. |
| 11 | Q    How long have you lived in Atlanta? |
| 12 | A    Six and a half years. |
| 13 | Q    Do you have work that do you there? |
| 14 | A    Yes, sir. |
| 15 | Q    What type of work do you do? |
| 16 | A    I'm a celebrity personal trainer. |
| 17 | Q    I'm sorry? |
| 18 | A    I'm a celebrity personal trainer. |
| 19 | Q    And how long have you been doing this type of work? |
| 20 | A    Six years. |
| 21 | Q    You wrote a letter to the Judge -- |
| 22 | A    Yes, sir. |
| 23 | Q    -- in this matter; is that correct? |
| 24 | A    Yes, sir. |
| 25 | Q    Were all the things stated by you in that letter the |

1   truth?

2   A    Yes, sir.

3   Q    Tell the Judge, if you would, about the abuse that you and

4   your brother suffered at the hands of the two babysitters that

5   you had when you were four and five years old, three and four

6   years old.

7   A    The house that we went to, it was a lot of knitting and

8   stuff there, and the guy, he seemed -- he seemed okay at times.

9   He was trying to kind of break me and Chris out of our shell,

10  because any time we were to go someplace, whether it was public

11  or somebody's home, we had to remain seated, no loud talking,

12  no playing, nothing, so he tried to get us to interact more in

13  a playful side, because me and Chris only had each other.  So

14  after a time period of going over there, he's trying to get us

15  to wrestle, things of that nature, pin us against each other,

16  and then he would start saying, okay, well, now you're going to

17  get it.  Okay.  What for?  Because you're playing in the house.

18       My mom believed in the belt, and as a child, you

19  know, we was scared of my mom, because when she said something

20  and we didn't do it, we were in trouble, period, so we did not

21  want to get a beating at all, so the guy would have us doing --

22  he would have us doing certain things that didn't make sense to

23  me.

24       The room that we would go to was adjacent to the

25  living room, and it would be sometimes -- I couldn't remember

1  nothing but an object coming from my mouth with liquid coming

2  from it.  I didn't know what it was or why I was going through

3  this, but Chris would often try to, I'll say, take stuff for me

4  so I wouldn't go through it.

5         Then it was different situations where we were

6  together, I remember two gentlemen being there, one was

7  interacting with Chris, one was interacting with me, and I

8  didn't -- I didn't want it to take place at all.  Chris was

9  crying.  There was one occasion, the gentleman had me hold his

10 penis while inserting it into my brother, and he was just

11 screaming so loud, I couldn't take it, I was just begging.  But

12 at the end of it he would always say, you open your mouth, I'm

13 going to tell your mama what you was doing in here, and we did

14 not want to get in trouble because we didn't know anything that

15 he was doing was wrong, all we could think about was what we're

16 going to experience when we get home, and we didn't want that

17 to take place, because, I mean, her -- we were raised in a

18 certain way not to act out in public, and with them saying we

19 were going around breaking stuff in the house, which was

20 entirely not true, we were fearful, so I mean we just did what

21 we were told.

22 Q    Michael, how did your family deal with this abuse when it

23 became known?

24 A    My mom, she tried to shield us from a lot.  She did not

25 want us to re-live situations at all, and growing up, it wasn't

1    the normal household that we had first known, because we was

2    trying to basically live our lives but we wouldn't confide in

3    each other how we felt in a lot of situations because we didn't

4    know how to handle -- how to handle things.

5            I went to -- Chris also went to Joanne's Emergency

6    Home, I went there twice, for emotional stress.  I just -- I

7    didn't know how to react at times, and I would just get real

8    emotional, even going into my teens, and my mom couldn't

9    understand what was going on, so she would try to get me help

10   in different situations, but I wouldn't open up like when I was

11   at Joanne's Emergency Home exactly what was going on, because

12   you don't -- don't tell people what all went -- that you went

13   through.  It's a manhood thing.  Being in a tough environment,

14   you don't want to say, okay, another man had his way with me,

15   you don't do that.

16           So, I mean, it was hard, because me and my brother,

17   we were growing up separate, and seeing -- it was times where

18   me and Chris would get bullied getting off the bus.  Chris

19   spit -- I mean, everybody spits, but a guy named Trey would

20   come up and just start punching Chris in the mouth.  I didn't

21   know what to do.  We went home, holding our head in shame.

22   Another time me and Chris was just walking down the street, a

23   group of guys in the neighborhood was throwing rocks, Johnny

24   heard and Johnny went out there with a stick threatening the

25   guys, but also with that we never talked about it, because we

1  didn't know how to communicate with each other, because it's

2  like, okay, we were taught to be a man, my mom is trying to

3  teach us how to handle things, but it's shameful to say, okay,

4  I'm getting bullied or this happened and, I mean, it was

5  stressful growing up.

6  Q    Do you think this abuse adversely affected you and

7  adversely affects you today?

8  A    Yes.

9  Q    And how about your brother Christopher?

10  A    I know if I'm 33 and still having effects, he's having

11  effects, either that or he just really emotionally buried it

12  where he tries not to acknowledge it.

13         MR. BEAVER:  Thank you, Your Honor.  I have nothing

14  further.  That all I have.

15         THE COURT:  Any questions?

16         MS. COOLEY:  No, Your Honor.  Thank you.

17         THE COURT:  Thank you.  Please watch your step.

18         MR. BEAVER:  That's all, Your Honor.

19         THE COURT:  All right.  At this time I'll hear

20  argument first from Mr. Beaver, I'll then hear from

21  Mr. Williams, if he wants to elocute, I'll then hear from

22  Ms. Cooley, I'll then hear again from Mr. Beaver.

23         Mr. Beaver?

24         MR. BEAVER:  Your Honor, the United States Supreme

25  Court has said it's been uniform and constant in the Federal

tradition where every sentencing Judge should consider every

convicted person as an individual and every case as a unique

study in human failings that sometimes mitigate and sometimes

magnify the crime and the punishment to ensue.  Underlying this

tradition is the principle that the punishment should fit the

offender and not merely the crime.  Congress codified this

principle in 18 United States Code 3661, which provides that no

limitation shall be placed on the information the Court may

consider concerning a defendant's background, character and

conduct; and in 18 United States Code 3553(a), I tried to be as

candid with the Court as I could be in my opening statements

when I said that this is just a horrible crime, it's a terrible

case, there's no excuse for the behavior that occurred here

that in any way justifies the conduct that occurred, but

harking back to the words of the United States Supreme Court is

that there are factors that bring every human being to the

point of where they are at a certain point in time.

    I repeat:  The sexual abuse that Christopher Jason

Williams suffered in this matter as a child does not excuse the

conduct, but Your Honor, I find it hard to believe that it does

not to some extent mitigate the conduct; and equally more

harmful than the actual abuse itself was the way it was handled

in this case.  You and I well know that every seed that plants

grows and it will continue to grow until at some point in time

it distinguishes itself or it manifests itself in something

1    very unpleasant.

2           In this situation, in the context of the early 1980s,

3    we have come -- traveled eons in that time in coming to

4    understand sexual abuse and the longterm effects of it on

5    anyone.  It's said in the scriptures that the sins of the

6    father are visited upon the children for seven generations, and

7    it's very similar to this situation, particularly when you get

8    sexual abuse in many, many instances, particularly when it's

9    coupled with the threat of physical violence or excessive

10   discipline being imposed upon children and that it is buried in

11   a family's background, it's like a wound that continues to

12   fester and fester and fester, and at some point in time to some

13   particular person it can have one effect and to another person

14   it can have another effect.

15          I believe that the evidence in this case tends to

16   show that the type of abuse that this young man was subjected

17   to combined with the fact that it went completely untreated, it

18   was basically swept under the rug with an attitude of, "if we

19   just don't talked about it, maybe this will just go away," and

20   it continued to fester and it created absolutely disgraceful

21   and abhorrent conduct, which is admitted by this defendant,

22   he's admitted this by pleading guilty to the two charges, by

23   accepting responsibility, by professing to you his acceptance

24   of responsibility, and the question now becomes what does the

25   Court do with this young man.

1      You've got a guideline range of 30 years to life,

2  Your Honor. You've got a world of tools at your disposal in

3  which to handle this matter. You have the fact that at some

4  point in time if Your Honor sees fit to let him be released, he

5  will be -- in my experience, 100 percent, will be likely --

6  certainly be the subject of examination to determine if he's a

7  sexual violent person, and if he's found to be so, a civil

8  proceeding will be brought and he will continue to be held

9  indefinitely until he no longer meets that criteria.

10     All that we are asking you for, all of these folks

11  who are here, his mother, his father, his brothers, his aunt,

12  his uncles, his pastor, his friends, the people who are the

13  support in the community, is asking that there be some end in

14  sight to the amount of punishment in terms of prison time that

15  he be subjected to.

16     He knows, his family knows and they are in acceptance

17  that he is going to prison, and he will probably go to prison

18  for many years, but we're asking the Court to consider giving

19  him some opportunity in the future to redeem himself and to

20  prove himself worthy of redemption.

21     There are a number of things that we can do to help

22  in that process. He abused alcohol and drugs ever since his

23  early teens, and he can be subjected to the most intensive

24  treatment for alcohol and substance abuse that's available in

25  the Federal prison system; he can be given vocational skills

1  and vocational training over that number of years; and most

2  importantly, he can receive the Federal prison system's various

3  mental health programs, particularly those aimed at sexual

4  abuse and sexual offenders; so if that day finally does come,

5  in Your Honor's discretion, that he is allowed perhaps the

6  opportunity to redeem himself or to prove himself indeed worthy

7  of redemption, he will have that opportunity and hopefully,

8  with the help of the Bureau of Prisons, will reach that point

9  in time.

10       What I'm asking the Court for is to consider all of

11  the circumstances surrounding this, look at the abuse that he

12  went through, and it appears, I would argue from the evidence,

13  beyond any dispute whatsoever that these things did occur.

14  People have testified to this.  His mother's friend of 40 years

15  has come forward.  Any argument of recent fabrication has been

16  thoroughly rebutted.  Her son, her other son who was a victim

17  of abuse, the other son who has borne the burden of guilt for

18  not being able to protect his younger brothers all of these

19  years have come forward.  These things occurred, and they

20  occurred with this young man, and they caused him exactly the

21  same type of mental problems that now appear to have at least

22  in part replicated themselves among the victims of this

23  offense, and so the sins of the father are passed on and on and

24  on for generations until somewhere or other we're able to put a

25  stop to it.

1          Hopefully with the wisdom of the Court, with the
2   wisdom of the Bureau of Prisons, and the various programs that
3   are available to him, and I repeat myself, he will indeed have
4   an opportunity of redemption or an opportunity to prove that he
5   is worthy of redemption.

6          So I ask the Court to consider all of that, I think
7   severally the revised 5H1.4, I believe it is, which has to do
8   with mental health and emotional conditions, and utilize that
9   as a vehicle for a meaningful and reasonable downward departure
10  from the guideline range of no less than 30 years in this
11  matter and set a time in the discretion of the Court earlier
12  than that where the defendant can be considered for release,
13  assuming he meets the criteria for that, assuming he's finished
14  all of these programs, and assuming that he is not shown to be
15  a sexually violent offender.

16         Thank you

17         THE COURT:  Thank you, Mr. Beaver.

18         At this time the Court will recognize Mr. Williams,
19  if you'd like to make a statement, sir.

20         THE DEFENDANT:  I just want to thank you for just
21  listening and giving, you know, your best decision and
22  hopefully put your faith in me one day.  I know I've got a lot
23  of time to do to make up for the wrongs I've done, and
24  everybody should have to, everybody should have to, and I just
25  ask for one day with my newfound love of the Lord to actually

1  follow after Pastor Bowman one day and preach to people and

2  actually, you know, stop the cycle of abuse and everything that

3  led me and other people down the paths that's leading

4  everything down, just destroying everything.

5          THE COURT:  Thank you, Mr. Williams.

6          At this time the Court will hear from Ms. Cooley on

7  behalf of the United States.

8          MS. COOLEY:  Thank you, Your Honor.

9          What we heard in the presentation of the defense case

10  was over and over again "the behavior that occurred," "the

11  conduct that occurred," "what happened to them."  We never

12  heard "what I did to them," "what I did."

13          I'm not asking -- I want to be clear, I'm not asking

14  the Court to take away his acceptance of responsibility based

15  upon the severe mitigation that we have heard here in Court

16  today, because we have agreed to that in our plea agreement and

17  I'm going to stand by those three points, given that even with

18  the three points, the guideline range is 360 to life, but I

19  think it is extremely informative when considering where within

20  the guideline range this man needs to be sentenced, under

21  3553(a) factors of the character and the history of this

22  defendant, what sentence he needs to receive.

23          He needs to receive a sentence that tells him what he

24  did to these victims -- because we haven't heard that from him

25  today, it's what happened, the behavior that occurred, the

1    conduct that occurred.

2            With respect to the motion for downward departure in

3    5H1.3, it is in fact an appropriate grounds for departure in

4    some situations; however, what the defendant doesn't talk about

5    is that it's appropriate when the mental and emotional

6    conditions are present to such an unusual degree that it

7    distinguishes the defendant from the typical case, an unusual

8    degree.

9            So first, Your Honor, I'd submit in order to

10   downwardly depart based upon 5H1.3 we'd first have to find that

11   there was in fact actually abuse; secondly, we'd have to find

12   that this abuse was so extraordinary that it distinguishes

13   Mr. Williams from the typical cases; and there is some case

14   law, Your Honor, in the 5H1.3 sentencing guidelines annotations

15   that -- they have cited some cases from several different

16   circuits, one of which is also the Fourth, that gives us some

17   guidance on what constitutes the unusual degree that is

18   necessary for departure based upon mental and emotional

19   conditions, and I have a couple of cases for Your Honor and for

20   the defense, I'm sure Your Honor probably has already read

21   them, the first of which is *United States versus Rivera* out of

22   the Second Circuit, 1991, that's 192 F.3d 81; also quoting

23   *U.S. versus Vela*, the defendant also quotes in his memorandum,

24   927 F.2d 197, from the Fifth Circuit in 1991; and *Vela* quotes

25   *U.S. versus Daly*, which is a Fourth Circuit case from 1989,

1  883 F.2d 313.  I have copies for both Your Honor and the

2  defense if he would like those.

3          THE COURT:  All right.

4          MS. COOLEY:  I'd like to read for you part of *Rivera*.

5  *Rivera* is very instructive.  At page 86 in the text of *Rivera*,

6  it's actually page 9 of 11 of the printout that Your Honor has,

7  it talks about the conditions that Rivera claims he suffered

8  that should warrant his downward departure under 5H1.3.  He was

9  born of familial rape, spent time in foster homes, stepfather

10  was killed when he was eight, he also reported being beaten

11  a lot and having his hands burned, being made to kneel on rice

12  in the corner and being struck with extension cords.

13          The Second Circuit says that:  These episodes of

14  corporal punishment could conceivably rise to a showing of

15  abuse, but Mr. Rivera has failed to allege and show, as

16  required for a 5H1.3 departure, that any abuse he may have

17  suffered rose to the extraordinary level that can be assumed to

18  cause mental or emotional pathology.  We decline to set a

19  standard for determining when that level is reached.

20          However, they cite a case, *Roe*, which the defendant

21  also cites in his memorandum, finding that the tragic

22  circumstances of the defendant's upbringing were extraordinary,

23  but in that case, Your Honor, again, what distinguished from

24  this one, in *Roe* the defendant there lived with her

25  drug-addicted mother and her mother's boyfriend, who was a

narcotics dealer, for much of her childhood; where the mother's boyfriend routinely raped and sodomized her, savagely beat her, sometimes as often as once a day, with belts, extensions cords and coat hangers, and subjected her to other perverse degradations; where, after running away from home at age 12, she had been forced to work as a prostitute and brutally beaten by a series of pimps, customers and boyfriends; and one psychiatrist noted that her abuses was so severe that she had become virtually a mindless puppet.

In that situation, Your Honor, they held that it was appropriate for downward departure. We have nowhere near that here. In fact, *Rivera* goes on to quote that the defendant there maintains that his abuse was significant and a mitigating factor to his subsequent behavior and poor exercise of judgment, which I would contend is exactly what the defense is saying here, but as much could be said of every criminal defendant who has suffered abuse as a child or corporal punishment at the hands of parents.

Switching now, Your Honor, to -- at that point in time *Rivera* actually quotes the *Vela* case, and the *Vela* case quotes the *Daly* case out of the Fourth Circuit, but the *Vela* case -- I'm on page 5 of 8, and this is at page 198 -- I'm sorry, 199, talking about *Vela*, it talks about the heartland of every crime and that the sentencing guidelines -- in determining whether it falls within the heartland or outside,

1    the sentencing Court should, quote, treat each guideline as

2    carving out a heartland, a set of typical cases embodying the

3    conduct that each guideline describes.  When a Court finds an

4    atypical case, one to which a particular guideline

5    linguistically applies but where conduct significantly differs

6    from the norm, the Court may consider whether a departure is

7    warranted.

8           They go on to quote a Fourth Circuit case in saying

9    that "Childhood abuse and neglect are often present in the

10   lives of criminals.  They always affect their mental and

11   emotional condition.  We simply cannot agree, therefore, that

12   these are the kinds of considerations which warrant substantial

13   reductions in guideline sentences."

14          I would submit to the Court that there is ample

15   support for the fact that while 5H1.1 can be a ground for

16   departure, it requires a severe situation such as cited from

17   *Roe* in the *Rivera* case in the type of defendant who should

18   warrant that downward departure.

19          In order to even get there to that analysis,

20   Your Honor, I would submit that we have to believe that this

21   abuse occurred.  I spent a lot of my career being an advocate

22   for victims of child abuse, both at the State level and at

23   Federal level.  I have interviewed victims who are very young,

24   I have worked with victims who are very young, seen a lot of

25   different sex offenders, and what I can tell Your Honor is that

1   warning bells go off when we try to say that now 30 years later
2   a child remembers something from when they were three or four.
3   I'm not saying it's impossible, I'm saying it is a warning bell
4   and should be considered in combination with the other factors
5   lending themselves to the credibility of that evidence, and
6   Your Honor heard the testimony so you can judge that
7   credibility.

8         I would submit to Your Honor that it was not
9   mentioned to Probation at paragraph 30, paragraph 33.  I would
10  submit that the timing of these accusations is critical to
11  judging their credibility.  Even if the Court were to find them
12  credible, I do not believe and I would argue that the necessary
13  conditions to depart downwardly based on mental and emotional
14  conditions considering the case law are not present, that it is
15  not present to an unusual degree, and that this does not fall
16  outside the heartland for this type of case.  In fact, we
17  routinely see sex offenders who have been abused as children
18  who then go on to offend.  It is in fact unfortunately the
19  heartland of those cases that that is a factor of these
20  defendants and that is not outside that realm.

21        The defendant mentions in passing a possible
22  4248 proceeding and that somehow we should take that into
23  consideration at sentencing because if we do not give him a
24  life sentence, then we could potentially later on cure that if
25  we find him to be a sexually dangerous person in a

1   4248 proceeding. We would ask the Court not to consider that

2   factor in sentencing. It's a factor in a civil proceeding for

3   a later consideration should we ever get to that point with

4   this defendant, and I do not believe that it warrants

5   consideration in this proceeding here today.

6         I'm obligated to inform the Court of the defendant's

7   cooperation, given that he signed a cooperation plea agreement.

8   He was debriefed by Detective Rose and an FBI Agent, James

9   Koehler. He did not provide any information that led to the

10   investigation, arrest or prosecution of any individuals, and

11   the United States is not seeking a 5K as a result. He did

12   provide some information in a very vague manner such that a big

13   light-skinned girl whose first and last name were unknown to

14   him was working some sisters out of a certain area and that

15   some girls in Raeford worked themselves, and also there might

16   be a, quote, gay dude on Bragg Boulevard who was working some

17   girls, nothing that would lead us to recommend a 5K.

18         I would note that the defendant's debrief, again

19   significantly mitigated his own involvement, but again we're

20   not moving to take away his acceptance of responsibility in

21   this case, as we have agreed to the three point reduction.

22         As far as the Government's arguments for where

23   Mr. Williams should be sentenced in the guideline range, I

24   would submit to the Court that while there is not a need to

25   consider an upward departure given that the upward limit here

is life, that some of the factors that could have been
considered should the guidelines have proven not to have been
life are instructive in determining where within the guideline
range we should sentence Mr. Williams based upon the 3553(a)
factors, the nature and circumstances of this offense.

One such factor that could be considered or facts
that would support it should we have had to move for an upward
departure are those for extreme psychological injury under
5K2.3.  With respect to Victim 1, Your Honor, she's still in a
locked treatment facility.  She has been there since this
incident.  It's a stepdown facility where she receives
intensive, intensive treatment with other victims of sexual
abuse and has to earn her way to different levels of lockdown.
I'm happy to report that she is finally no longer in 24 hour
lockdown, but it's been a long road and it's been a long time
since she was rescued.  It's been almost a year.  She has
severe PTSD and sleep disorders.  This has affected her
tremendously.  When they first rescued her, she was found to
have been physically, sexually and emotionally abused by this
defendant right off the bat, and only as the disclosures have
continued to come in her treatment have they discovered how
deeply he has hurt her.  Extreme psychological injury.

5K2.8, extreme conduct, gratuitous infliction of
injury and prolonged pain or humiliation.  These sexually
explicit images of the victims were placed on the internet on

multiple commercial sites over the course of months, many, many

postings.  These girls, while barely meeting the requirements

for these websites to not take them down because there was a

G-string present, there is more than enough that is not left to

the imagination by the images that were all over the internet

of these girls.  Those images they can't take back.  All of the

people in their communities could see them.  In fact, they had

so many clients, as even the victims call them, that Victim 1

doesn't want to go back there because she's afraid to run into

them in the grocery store when she's with her family.  That's

extreme conduct.

They were forced to have sex and perform sex acts on

countless johns, countless.  They couldn't even tell us how

many.  That is extreme conduct.  He tattooed Victim 1 in four

places because she didn't look old enough, and when he wanted

to put her on the website, she didn't look old enough, so he

had to tattoo her.  He kept her in the attic.  I asked John

Williams how did he get up in the attic.  He's 5'10".  He

couldn't even get himself in the attic.  She was put in the

attic.  That is extreme conduct.

The overtones of the defendant's arguments here at

sentencing today is that this was Victim 1's fault, that she

was happy, that she wanted it, that she went along with it,

that there's really no problem here but for the fact that,

whoops, she was underage.  This is a tragedy on a community

1  level that not one person stopped this.  What we have seen

2  today should not be taken by the Court as because she was happy

3  when these, however many, five people testified that when they

4  saw her she seemed happy, we should not take away that that

5  means that she was not abused, because that is not what that

6  means.  As Your Honor well knows from hearing many of these

7  cases, there is so much more underlying the physical, emotional

8  and mental abuse that is going on in those cases, what we

9  should take away is that willful blindness allowed that to go

10  on for many, many more months than it had to.

11          The reality is that he is the one who had the

12  accounts, who controlled the multiple postings, he is the one

13  who had to make at least $600 a month to pay the rent, told her

14  that she had to work.  How did she have to work?  By being

15  posted online, by having sex with men.  He had a $1,000 dog.

16  How did he pay for the dog?  She had to work.  He didn't have a

17  job.  And yes, he did work at Cheddar's for a little bit when

18  he was living in his mother's house, but as Your Honor can see

19  from the PSR, not when he was in that apartment paying that

20  rent.  He forced them to have sex with these men while he was

21  in the room next door.  It was calculated.  He is the predator.

22  He was 33 and they were 14 and 15, and you cannot tell me that

23  no one knew the difference.

24          He recorded and photographed them many, many times,

25  92 confirmed images of sexually explicit positions, at his

direction.  These are things that he was directing, this is not
something that they wanted.  Detective Smith testified to his
words on those videos, and Your Honor can view the videos if
you need to, but his direction, he was directing the traffic.

He beat them and he threatened them.  Victim 2, when
she came forward, said that she didn't really care about
herself but was worried about Victim 1 because he was beating
her.  She realized she had credibility issues.  The reality is
that these victims are not victims who have never been through
something in their life, but she was worried about Victim 1
because he beat her and threatened her.  He kept the victim in
the attic.  He tattooed her to make her more marketable.  This
is his fault; let us not make it theirs.

Yes, Victim 1 referred in her victim impact statement
to him as her boyfriend.  She talked about how she was upset
when he was with another woman.  That is why 1591 and the
provision we have charged here is based upon age.  She's been
abused, she's been mistreated, she's been thrown away, her
world view is skewed and she is troubled and she does not speak
for herself, but I speak for her, and it is not okay.

The only way to deter this man from doing it again is
to keep him in prison for a long, long time.  The only way to
protect the public and the other girls from this happening ever
again is to keep him in prison for a long, long time.  There's
evidence that he has trafficked other girls before.  There were

1    other unknown images on his phone that we were unable to

2    determine who they were.  Victim 1 said that at the first

3    apartment there was another girl there being worked as well.

4           I think that the victim impact speaks for itself.  I

5    think it's evident in their statements that they are troubled.

6    I think that it is evident in their statements that they are

7    deeply affected by what he has done to them.

8           Your Honor, we ask you to consider everything that

9    the Government has put forth today with regard to the 3553(a)

10   factors in fashioning a sentence that is sufficient but not

11   greater than necessary to protect the public, to deter this

12   man, to keep him from ever doing it again.  We ask you to

13   specifically decline to downwardly depart based on 5H1.3, and

14   find that the defendant's evidence lacks credibility and does

15   not rise to the level of an unusual degree in order to warrant

16   that departure.  We ask that you stop the abuse forever today

17   and we ask that you give him a life sentence.

18           Thank you, Your Honor.

19           THE COURT:  Mr. Beaver?  Anything else, Mr. Beaver?

20           MR. BEAVER:  Your Honor, the only thing I would point

21   out is that the cases under 5H1.3 referred to by the prosecutor

22   in this matter were 1991 cases and 5H1.3 was completely

23   rewritten effective November 1 of 2010 to wipe out any

24   requirement of extraordinary -- a showing of extraordinary

25   abuse or extraordinary mental health problems in order to vary.

```
1    It's a much lower standard than it was in 1991.
2             THE COURT:  Thank you.
3             MS. COOLEY:  Your Honor, if I may just briefly
4    respond to that.
5             THE COURT:  Yes.
6             MS. COOLEY:  The amendment here, and if Your Honor
7    looks at the annotated version, which I can hand up if you
8    would like for me to, 5H1.3 the only change is that it deleted
9    the language that says mental and emotional health conditions
10   were, quote, not ordinarily relevant, and changed that to,
11   quote, may be relevant.  That was the amendment.
12            THE COURT:  Let's take a recess until 4:30.
13                       -  -  -  -  -
14            (Recess at 4:19 p.m. until 4:33 p.m.)
15                       -  -  -  -  -
16            MR. BEAVER:  Your Honor, may I make one further
17   request that I had not mentioned before?  One of the things in
18   the sentence on this matter, we truly want him to be in a place
19   that he can get the best psychological treatment, and from what
20   I've been able to read about the prison system, and it's
21   convenient, for my convenience also, if Your Honor could
22   recommend that he be incarcerated at Butner, we would very much
23   appreciate that.
24            THE COURT:  All right.  Mr. Williams, the Court
25   recognizes its obligation to impose a sentence sufficient but
```

not greater than necessary to comply with the purposes set
forth in the statute. I have considered all the arguments that
Mr. Beaver has made, I have considered your statements, sir, I
have considered the evidence that's been presented here today,
I have considered the position of the United States. I have
considered the advisory guideline range. Among other things
I've considered the nature and circumstances of the offense and
the history and characteristics of the defendant, the need for
the sentence imposed to reflect the seriousness of the offense,
to promote respect for the law and to provide just punishment,
the need for the sentence imposed to deter others who might
choose to engage in the criminal behavior that brings you here,
the need for the sentence imposed to protect the public from
further crime by you, the need for the sentence imposed to
provide you with needed education or vocational training,
medical care or other correctional treatment in the most
effective manner. The statute raises a number of other
factors, I have considered all of them, although I won't
mention each one individually.

As for the traditional departure motion under 5H1.3,
5H1.3 states that, quote, mental and emotional conditions may
be relevant in determining whether a departure is warranted, if
such conditions, individually or in combination with other
offender characteristics, are present to an unusual degree and
distinguish the case from the typical cases covered by the

1    guidelines.  In certain cases a downward departure may be
2    appropriate to accomplish a specific treatment purpose.  Mental
3    and emotional conditions may be relevant in determining the
4    conditions of probation or supervised release; e.g.,
5    participation in a mental health program; all again quoting
6    5H1.3.

7         I recognize my discretion under that provision.  I
8    have read the cases under that, not only the cases that the
9    lawyers have cited here but more cases than that.  I recognize
10   my discretion.  I have taken into account, I do credit, I do
11   think you -- I found the presentation concerning you having
12   been abused as a child -- I think that that happened, but I
13   don't think that it warrants a departure in this case, I think
14   in my discretion that this is not outside the heartland, and so
15   I'm not going to downwardly depart on that basis with respect
16   to your offender characteristics associated with mental and
17   emotional conditions.

18        As for the 3553(a) factors, the first thing I'm to
19   consider is the nature and circumstances of the offense, and I
20   sentence a lot of people, I see a lot of cases, and this case
21   involves extraordinarily retched behavior of one human being
22   towards not just another human being but towards two other
23   human beings who were both children in the eyes of the law, a
24   14-year-old and a 15-year-old.  To treat someone that way, a
25   real human being, however troubled their childhood, is just

really horrible.  Again, I see, sadly, man's inhumanity to man

on a daily basis in here, and this is extraordinarily egregious

conduct both in terms of how you treated them and then the

trafficking of them, the videotapes, the photographs, the

posting things on the internet.

       Things that go up on the internet, somebody's image

goes up, it's there forever.  A child who is abused, it never

comes out, it never comes off, it's out there forever, and it's

a constant reality for any victim of abuse to know that, right,

that the abuse is bad enough, and then if it's memorialized

forever on the internet, that's an aggravating factor, and then

here there were, you know, multiple images.

       So when I look at that and I think about the offense

behavior, I also don't have a situation where it's a one time

incident, as bad as that might be, I mean, it is day after day,

week after week, we're talking particularly as to Victim 1,

month after month of sexual abuse and sex trafficking for

money, prostituting a child, prostituting a child.  It's

horrible.  Words really escape me to describe that reality.

       As for your history and characteristics, I have taken

into account, I've read all the letters, and you're fortunate,

it's a testament to the people who are here in support of you

to their character more so than yours, I'll say that.  You're

fortunate that they are still supportive of you and will be

supportive of you wherever you are; and you obviously know

1    you're going to prison and need to go to prison and will go to

2    prison, but you're fortunate in that respect to have friends

3    and family who are still supportive of you notwithstanding the

4    choices that you made.

5            Again, I recognize the arguments made about cycle of

6    abuse, and that quite often certainly in the literature and in

7    my own anecdotal experience you do have people who have been

8    abused become abusers, but it cuts a couple ways in the sense

9    of what does society do with somebody who has been abused and

10   then becomes an abuser and is a violent abuser in terms of

11   incapacitating that person and protecting the public and taking

12   into account the sheer horror of the behavior, and I have to do

13   all that in weighing all of these arguments that have been made

14   today, and I will do that in the sentence that I'm going to

15   announce today.

16           You do have some work history, I have read the

17   report, you do have, you know, some criminal history, I've

18   taken that into account.  You do have a substance abuse problem

19   that Mr. Beaver mentioned, I've taken that into account.  You

20   have earned your GED, you have attended different schools.

21   I've taken the totality of your life into account, as I am to

22   do, and Mr. Beaver quoted a leading Supreme Court case about

23   that and I recognize and take seriously that obligation to take

24   into account the individual and the offense and the whole

25   history and the totality.  I will impose a sentence that

1    provides just punishment.

2            I will say, although neither side cited it, the

3    Eighth Circuit at least in a case called *U.S. v Jeffries*,

4    615 F.3d 909, at pages 9, 11 and 12, Eighth Circuit 2010,

5    addressed the topic about how a Court, if at all, should

6    consider the Adam Walsh Act in 18 U.S.C. Section 4248 in

7    imposing a sentence in a case that involves a sex offender, and

8    at least in *Jeffries* the Court said that a District Court

9    shouldn't use that, it's a completely separate proceeding, in

10   terms of the 3553(a) factors, both in terms of imposing just

11   punishment and taking into account the nature of the offense

12   and the need to incapacitate.

13           So I do think *Jeffries* is persuasive in terms of

14   somehow thinking, well, if somebody is subject to this being

15   reviewed -- and every Federal offender is subject to review,

16   every one.  You can be a felon in possession, they're going to

17   review your file and determine whatever a psychologist

18   determines and a panel determines you ought to be designated,

19   and then there's a separate proceeding, so I don't think that

20   that is, as the *Jeffries* court describes, something that I

21   should take into account in balancing the 3553(a) factors.

22           I do think there is a need for serious punishment for

23   the serious offense behavior that took place over a long period

24   of time.  I don't doubt for a minute that the people, Victim 1

25   and Victim 2, are severely mentally affected and physically

affected by the abuse and will be forever, and I think any

child is who is abused, and I've taken that into account,

again, in thinking about the offense.

I do think there's a great need to incapacitate.  I'm

not going to go as high as the Government asks for, but I'm

going to impose a substantial sentence, it's a sentence I think

that is sufficient but not greater than necessary on each of

these counts.

Because of the extraordinarily egregious conduct, the

need to incapacitate, the need to impose just punishment, the

need to protect the public, having fully considered the entire

record in this case, pursuant to the Sentencing Reform Act of

1984 and in accordance with the Supreme Court's decision in

*United States v Booker* and its progeny, it is the judgment of

the Court that the Defendant Christopher Jason Williams is

hereby committed to the custody of the Bureau of Prisons to be

imprisoned for a term of 540 months on each count, to be served

concurrently.  Pursuant to the plea agreement, Counts 3 through

10 are hereby released.

Upon release from imprisonment, the defendant shall

be placed on supervised release for a term of life.  Within

72 hours of release from the Bureau of Prisons the defendant

shall report in person to the probation office in the district

to which he's released.  While on supervised release the

defendant shall not commit another Federal, State or local

1   crime and shall not illegally possess a controlled substance.

2   The defendant shall comply with the standard conditions and the

3   following additional conditions:  He'll participate in a

4   narcotic treatment program, he'll consent to a warrantless

5   search, he'll cooperate in the collection of DNA, he'll have no

6   contact directly or indirectly at any time for any reason with

7   either of the victims or the victims' families.

8           You shall submit to a psychosexual evaluation by a

9   qualified mental health professional.  You shall participate in

10  a sex offender treatment program as directed by Probation.  You

11  shall submit to physiological testing, which can include

12  polygraph examinations, to monitor your compliance.  Your

13  residence and employment shall be approved by the U.S.

14  probation officer.  Any proposed change in residence or

15  employment must be approved by Probation at least ten days

16  before the change.  You shall comply with the requirements of

17  the Sex Offender Registration and Notification Act as directed

18  by Probation.  You shall not associate with persons under the

19  age of 18 except in the presence of parents or their legal

20  guardians.  This condition, however, does not mean you cannot

21  deal in the ordinary course with commercial services, servers,

22  cashiers, ticket venders, et cetera, with whom you might

23  interact.

24          You shall not purchase, use, possess, procure or

25  otherwise obtain any computer or electronic device that can be

1  linked to any computer network, bulletin board, internet,

2  internet service provider, exchange format involving computers

3  unless approved by Probation.  I think that condition is

4  appropriate in light of the child pornography issues in this

5  case.

6          You shall submit to unannounced searches of any

7  computer or computer equipment, including any mobile phone, in

8  the discretion of the United States Probation Office, which may

9  include the use of computer monitoring technology, computer

10  search or analysis software, copying of all data from the

11  device and external peripherals.  Such examinations may require

12  the removal of devices from the defendant's possession for

13  purposes of conducting an inspection.

14          At the direction of Probation you shall consent to

15  the installation of systems or software that will allow

16  Probation to monitor any computers that you have access to, and

17  you shall pay the costs of such monitoring.  You shall not use,

18  possess or control any computer-based counterforensic tools.

19  You shall not have installed any programs specifically and

20  solely designed to encrypt data.  You shall upon request

21  immediately provide Probation with any and all passwords

22  required to access data composed or encrypted in connection

23  with any devices you may possess.

24          You should not be employed in any position or

25  volunteer in connection with children under the age of 18

absent the express written approval of your probation officer.
You shall not be in any position of trust over a person under
the age of 18.

You'll pay a special assessment of $200.

I have imposed this sentence having fully considered
all the 3553(a) factors.  I think I've properly calculated the
advisory guideline range.  Nonetheless, to the extent that I
haven't, I announce as an alternative variance sentence that I
would impose this same sentence having fully considered all
3553(a) factors under *U.S. v. Hargrove*, Fourth Circuit 2012,
*U.S. v. Savillon-Matute*, Fourth Circuit 2011, *U.S. v. Keene*,
Eleventh Circuit 2006.

I do recommend mental health assessment and
treatment.  I do recommend sex offender treatment.  I do
recommend intensive substance abuse treatment.  I recommend
vocational and educational opportunities.  I recommend
FCI Butner in accordance with the defendant's request.

Mr. Williams, you can appeal your conviction if you
believe that your guilty plea was somehow unlawful or
involuntary or if there's some other fundamental defect in the
proceeding that was not waived by your guilty plea.  You also
have a statutory right to appeal your sentence under certain
circumstances, particularly if you think the sentence is
contrary to law.  However, you did enter into a plea agreement
which contains an appellate waiver.  In light of your sentence,

I believe you've waived your right to appeal your sentence.  If
you believe the waiver is unenforceable or inapplicable, you
can present that theory to the Appellate Court.  With few
exceptions any notice of appeal must be filed within 14 days of
the judgment being entered on the docket in your case.  If
you're unable to pay the cost of an appeal, you may appeal for
leave to file in forma pauperis.  If you so request, the clerk
will prepare and file a notice of appeal on your behalf.

        Mr. Beaver, I think I made all the recommendations
you asked for.  Is there anything else today in Mr. Williams'
case?

        MR. BEAVER:  No, Your Honor.

        THE COURT:  Anything else from the Government?

        MS. COOLEY:  No, Your Honor.

        THE COURT:  I thank counsel.  That will conclude the
matter involving Mr. Williams.

        Good luck to you, sir.

        The Court will be in recess until 9:00 a.m.

                    - - - - -

        (Proceedings concluded at 4:54 p.m.)

                    - - - - -

1               C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript of

4     proceedings taken in a sentencing hearing in the United States

5     District Court is a true and accurate transcript of the

6     proceedings taken by me in machine shorthand and transcribed by

7     computer under my supervision, this the 24th day of January,

8     2014.

9

10

11                              /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25